# *Davis v. City of Lake City*

United States District Court for the Middle District of Florida, Jacksonville Division

March 15, 2013, Decided; March 15, 2013, Filed

Case No. 3:10-cv-1170-J-34TEM

**Reporter**
2013 U.S. Dist. LEXIS 201487 *; 2013 LX 87200; 2013 WL 12091324

RUDOLPH DAVIS, SR., Plaintiff, vs. CITY OF LAKE CITY, FLORIDA, Defendant.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Costs and fees proceeding at *Davis v. City of Lake City, 2013 U.S. Dist. LEXIS 198109 (M.D. Fla., May 21, 2013)*

Affirmed by *Davis v. City of Lake City, 553 Fed. Appx. 881, 2014 U.S. App. LEXIS 1209, 2014 WL 241754 (11th Cir. Fla., Jan. 23, 2014)*

**Prior History:** *Davis v. City of Lake City, 2011 U.S. Dist. LEXIS 172384 (M.D. Fla., Nov. 14, 2011)*

**Counsel:** [*1] For Rudolph Davis, Sr., Plaintiff: Marie A. Mattox, LEAD ATTORNEY, Marie A. Mattox, PA, Tallahassee, FL.

For City of Lake City, Florida, Defendant: Susan S. Erdelyi, LEAD ATTORNEY, Meagan Lindsay Logan, Marks Gray, PA, Jacksonville, FL.

**Judges:** MARCIA MORALES HOWARD, United States District Judge.

**Opinion by:** MARCIA MORALES HOWARD

## Opinion

**ORDER**

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment (A Dispositive Motion) with Supportive Memorandum of Law (Doc. 42; Motion) filed on March 27, 2012. Plaintiff Rudolph Davis, Sr. initiated this action against Defendant City of Lake City, Florida (the City) on December 21, 2010. See Complaint (Doc. 1). On February 18, 2011, Davis filed an Amended Complaint (Doc. 6) alleging that the City violated *Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq.*, and the *Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01 et seq.*, by discriminating against Davis on the basis of race (Counts I and II) and retaliating against him for engaging in protected conduct (Counts III and IV). See generally Amended Complaint. In the Motion, the City requests that the Court enter summary judgment in the City's favor pursuant to *Rule 56, Federal Rules of Civil Procedure* (Rule(s)). See Motion at 1. Davis filed a response in opposition to the Motion [*2] on May 14, 2012. See Plaintiff's Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 48; Response). With leave of Court, see Order (Doc. 59), Defendant filed Defendant's Reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 60; Reply) on July 9, 2012. Both parties also filed notices of supplemental authority. See Defendant's Notice of Filing Supplemental Authority Regarding Motion for Summary Judgment (Doc. 66), filed October 19, 2012; Plaintiff's Notice of Supplemental Authority in Support of His Response in Opposition to Defendant's Motion for Summary Judgment (Doc. 69), filed December 13, 2012. Additionally, on June 4, 2012, Defendant filed Defendant's Motion to Strike False and Inadmissible Evidence Contained in Documents Filed by Plaintiff in Opposition to Defendant's Motion for Summary Judgment (Doc. 53; Motion to Strike). Plaintiff responded to the Motion to Strike on June 18, 2012. See Plaintiff's Response in Opposition to Defendant's Motion to Strike [Doc 53] (Doc. 57; Response to Motion to Strike).[1] On December 20, 2012, the Court held oral

[1] Upon review, the Court determines that the Motion to Strike is due to be denied because it is procedurally improper. See *Polite v. Dougherty Cnty. Sch. Sys., 314 F. App'x 180, 184 n.7 (11th Cir. 2008)* (finding no error in the district court's denial of a motion to strike an affidavit because "motions to strike are only appropriately addressed towards matters contained in the pleadings; here, the affidavit was submitted as part of the motion for summary judgment, which is not a pleading"); *Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC, 845 F. Supp. 2d 1241, 1252-53 (M.D. Fla. 2012)*. However, to the extent the City argues in the Motion to Strike that several of the contentions made in Davis' Response are not properly

Page 2 of 23


argument on the Motion for Summary Judgment. See Minute [*3] Entry (Doc. 70). Accordingly, this matter is ripe for review.

### I. Background[2]

Plaintiff Rudolph Davis, Sr. (Davis) worked at the Lake City Police Department (LCPD) for nineteen years, from June of 1990 to November of 2009. See Response, Ex. 107: Affidavit of Rudolph Davis, Sr. (Davis Aff.) ¶¶ 1, 54. Over the course of his career Davis rose to the rank of captain, and was second-in-command at the time of his termination. See Motion, Exs. 8-10: Deposition of Rudolph Davis, Sr. (Davis Dep.) at 211, 218. While at the LCPD, Davis filed several internal grievances complaining of race discrimination, and at least four EEOC charges against four different heads of the LCPD: Chief David Allbritton,[3] Chief Steven Burch, Captain Bruce Charles, and Chief Argatha Gilmore. See Motion, Ex. 2: Affidavit of Blair Payne (Payne Aff.) ¶¶ 4-5, 11, 14, 18, 20, 24, 33. Davis' allegations as to Burch and Charles generally related to purported favoritism shown to a white officer, Lieutenant Joe Moody, the failure to select Davis to serve as the acting or interim chief on two occasions, and the initiation of two internal affairs (IA) investigations against Davis. See generally Response at 18-25.

On September [*4] 28, 2009, Gilmore took over as the new chief of the LCPD, and remains in that position to date. See Motion, Ex. 11: Declaration of Argatha Gilmore (Gilmore Decl.) ¶¶ 3, 4. Seven weeks after her arrival, on November 16, 2009, Gilmore terminated Davis' employment with the LCPD. See Davis Aff. ¶ 54. Davis' termination was not the result of any misconduct. Gilmore Decl. ¶ 21. Rather, Gilmore explained to Davis in a termination letter that she had "observed and assessed" her "immediate command structure" and determined that she needed to establish "a more effective leadership team." Gilmore Decl. ¶ 21, Ex. 3. As such, Gilmore concluded that Davis' "services as a Captain" of the LCPD were "no longer needed." Id. Prior to terminating Davis, Gilmore was aware that Davis had previously filed EEOC charges, see Response, Ex. 96: Deposition of Argatha Gilmore (Gilmore Dep.) at 17, although he had not filed any internal grievances or EEOC charges naming Gilmore or City Manager Wendell Johnson at that time. See Motion, Ex. 23: Declaration of Wendell Johnson (Johnson Decl.) ¶ 13. Following his termination, Davis filed a charge of discrimination with the EEOC concerning Gilmore's actions. See Davis [*5] Aff. ¶ 58; Payne Aff., Ex. 37. On September 8, 2010, the EEOC issued two letters of determination finding reasonable cause to believe that violations of Title VII occurred with respect to Davis' charges against Burch, Charles and Gilmore. See Response, Exs. 80-81. Thereafter, Davis initiated the instant lawsuit. See Complaint (Doc. 1), filed December 21, 2010.

### II. Standard of Review

Under *Rule 56, Federal Rules of Civil Procedure* (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rule 56(a)*. The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Rule 56(c)(1)(A)*.[4] An issue is genuine when the

supported by admissible evidence as required by *Rule 56(c), Federal Rules of Civil Procedure*, the Court construes these arguments as evidentiary objections and will consider them, where necessary, in its analysis of the Motion for Summary Judgment. See *Addison v. Ingles Mkts., Inc., No. 3:11-CV-3 (CAR), 2012 U.S. Dist. LEXIS 117760, 2012 WL 3600844, at *1-2 (M.D. Ga. Aug. 21, 2012)*; see also *Rule 56(c)(2)*, 2009 advisory committee note ("There is no need to make a separate motion to strike.").

[2] As discussed infra, for the purposes of resolving the City's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Davis. The Court notes that these facts may differ from those ultimately proved at trial. See *Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002)*.

[3] Davis concedes that those claims stemming from various incidents occurring under Allbritton are time-barred. See Response at 18. As such, the Court will not set forth those allegations in detail. To the extent Davis maintains that those events are evidence of the City's discriminatory or retaliatory intent, the Court has reviewed and considered this evidence and will discuss its probative value below. See infra note 23.

[4] *Rule 56* was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." *Rule 56* advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains [*6] unchanged. The language of *subdivision (a)*

Page 3 of 23


evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See *Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)* (quoting *Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993))*. "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See *Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991)*. "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)* (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson, 477 U.S. at 248*. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995)* (citing [*7] *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994))*.

### III. Applicable Law[5]

### A. Race Discrimination

Title VII provides "that it is unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997)* (quoting *42 U.S.C. §§ 2000e-2(a)(1)*). A plaintiff may establish a Title VII discrimination claim through the introduction of direct or circumstantial evidence or statistical proof of discrimination.[6] *Lee v. U.S. Steel Corp., 450 F. App'x 834, 839 (11th Cir. 2012)* (citing *Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010))*. Where, as here, the plaintiff relies on circumstantial evidence of discrimination,[7] the Court applies the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *Alvarez, 610 F.3d at 1264*. However, a plaintiff may also present "circumstantial evidence that creates a triable issue concerning the

---

> continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former *Rule 56* standard of review remains viable and is applicable here.

[5] Davis asserts parallel race discrimination and retaliation claims under Title VII and the FCRA. See generally Amended Complaint. "Because the FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework, the state-law claims do not need separate discussion and their outcome is the same as the federal ones." See *Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1271 (11th Cir. 2010)* (internal citation omitted); *Gray v. City of Jacksonville, Fla., 492 F. App'x 1, 3 (11th Cir. 2012)*.

[6] Title VII encompasses disparate treatment discrimination claims as well as disparate impact claims. *Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994)*. Davis has not alleged disparate impact discrimination, which involves facially neutral employment practices which have significant adverse effects on protected groups, the evidence of which usually focuses upon statistical disparities rather than specific incidents. See *Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807-08 (11th Cir. 2010)*. Here, Davis' race discrimination claims are premised on disparate treatment; he contends that the City took a number of actions against him because of his race. See *Reeves, 594 F.3d at 807*.

[7] Davis does not argue that he has presented direct evidence of intentional discrimination. A plaintiff may "present direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude." *Hill v. Metro. Atlanta Rapid Transit Auth., 841 F.2d 1533, 1539 (11th Cir. 1988)*, amended on reh'g on different grounds, *848 F.2d 1522 (11th Cir. 1988)*. "Direct evidence is that which shows an employer's discriminatory intent 'without any inference or presumption.'" *Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000)*(citation omitted). However, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination. *Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)*.

Page 4 of 23


employer's discriminatory intent." Edmond v. Univ. of Miami, 441 F. App'x 721, 723 (11th Cir. 2011) (citing Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)).

When relying on the McDonnell Douglas framework to support a claim of discrimination, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. A plaintiff establishes a prima facie case of discrimination under Title VII by showing: "(1) [he] is a member of the protected class; (2) [he] was subjected to adverse employment [*8] action; (3) [his] employer treated similarly situated [white] employees more favorably; and (4) [he] was qualified to do the job." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) (internal quotations omitted) (fourth alteration in original); see also Holifield, 115 F.3d at 1562. "To make a comparison of the plaintiff's treatment to that of [an employee outside plaintiff's protected class], the plaintiff must show that he and the employees are similarly situated in all relevant respects." Holifield, 115 F.3d at 1562. If a plaintiff cannot identify a similarly situated comparator who was treated more favorably than himself, "summary judgment is appropriate where no other evidence of discrimination is present." Id.

Significantly, with respect to the second prong of the prima facie case, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001). Rather, the Eleventh Circuit instructs that "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." Davis, 245 F.3d at 1239; see also Crawford v. Carroll, 529 F.3d 961, 974 n.14 (11th Cir. 2008) (noting that the broader standard applicable in retaliation claims has no application to substantive Title VII discrimination claims). While [*9] a plaintiff is not required to prove "direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." Id. "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id.; see also Holland v. Gee, 677 F.3d 1047, 1057 (11th Cir. 2012); Miller-Goodwin v. City of Panama City Beach, Fla., 385 F. App'x 966, 970 (11th Cir. 2010). "Otherwise . . . every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Doe v. DeKalb Cnty. Sch. Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) (internal quotations omitted).

If the plaintiff presents a prima facie case, that evidence "creates a presumption that the employer unlawfully discriminated against the employee," then the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); Alvarez, 610 F.3d at 1264. If the defendant meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination and was not the "true reason for the employment decision." Burdine, 450 U.S. at 256; Alvarez, 610 F.3d at 1264; Holifield, 115 F.3d at 1565 ("[T]he plaintiff has the opportunity [*10] to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." (citing McDonnell Douglas, 411 U.S. at 804)). A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against [him]." Alvarez, 610 F.3d at 1264.

**B. Retaliation**

Under Title VII an employer is also prohibited from retaliating against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." See Crawford, 529 F.3d at 970. As with [*11] a substantive race discrimination claim, if an employer articulates legitimate reasons for its actions, a plaintiff must then "'show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.'" See McCann, 526 F.3d at 1375 (quoting Sullivan v. Nat'l R.R. Passenger Corp.,

Page 5 of 23


170 F.3d 1056, 1059 (11th Cir. 1999)). To establish pretext, a plaintiff must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004)).

Significantly, an "adverse employment action" for purposes of a retaliation claim encompasses a wider range of employer conduct than in the substantive discrimination context. See Crawford, 529 F.3d at 973-74. Although the Eleventh Circuit previously applied the same standard in both types of cases, the Supreme Court "redefined the standard for retaliation claims under Title VII" in Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). See Crawford, 529 F.3d at 970, 973-74. The Burlington Court held that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington, 548 U.S. at 64. Thus, under Burlington, "the type of employer conduct considered actionable has [*12] been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or work-place related." See Crawford, 529 F.3d at 973 (citing Burlington, 548 U.S. at 67-68). Conduct is "materially adverse" in the retaliation context if it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68 (internal quotations omitted). However, the Supreme Court instructs that the "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," such that "petty slights, minor annoyances, and simple lack of good manners" are generally not sufficient. Burlington, 548 U.S. at 67-68. Therefore, while it is usually for the jury to decide whether an employer's actions are materially adverse, petty and trivial actions are not sufficient. Rainey v. Holder, 412 F. App'x 235, 238 (11th Cir. 2011) (citing Crawford, 529 F.3d at 974 n.13)); Foshee v. Ascension Health-IS, Inc., 384 F. App'x 890, 892-93 (11th Cir. 2010).

## IV. Analysis

### A. Chief Steven Burch

Davis asserts a myriad of complaints stemming from Burch's brief tenure as police chief. To support his claim of race discrimination and retaliation, Davis relies on the following: (1) his receipt of a "monkey" email; (2) Lieutenant Joe Moody's better hours and fewer [*13] responsibilities; (3) Moody's receipt of a new vehicle before Davis; (4) Moody's assignment to a better office than Davis; (5) Burch's refusal to provide Davis with a stipend for his cell phone usage; (6) the entrustment of the evidence key to Officer Steve Shaw; (7) an instruction to answer the phone politely; (8) a requirement that Davis wear his police uniform, rather than civilian clothes; and (9) the removal of some of Davis' duties following his complaint.[8] See Response at 18-23. First, with respect to several of these acts, the record conclusively establishes that the conduct was neither discriminatory nor retaliatory. As to the remaining allegations, the Court concludes that, even when considered cumulatively, an objectively reasonable person would not consider these actions to be "materially adverse" under either the race discrimination or retaliation standard.[9]

---

[8] Without citation to the record, Davis argues that "Plaintiff was assigned more duties than Moody and then stripped of his duties after he complained of racism." See Response at 21. It appears that this argument relates to a conversation Davis had with Moody where Davis complained about the lack of a cell phone stipend and the amount of work he had as compared to Moody. See Davis Dep. at 166-69, 456-57. At the end of this conversation, Burch told Davis to go home over the weekend and think about whether he wanted to continue as a lieutenant at the LCPD. See id. at 169. Burch instructed Moody that he would be the on call officer for the weekend, and a note was put in the "pass on book" that the officers were to contact Lieutenant Moody rather than Davis if there were any issues with patrol. See id. at 166-67, 169, 456-57; see Burch Decl. ¶ 18. Temporarily relieving Davis of his on call responsibilities for one weekend after Davis had complained that he had too many duties and informed his supervisors that he would no longer answer his personal cell phone for work calls is not an adverse action, much less retaliatory or discriminatory. See Gray, 492 F. App'x at 10 ("We are hard pressed to fathom how an employer's removal of work duties, undertaken in response to an employee's complaint that she is overwhelmed with work, could in any way be deemed 'adverse,' much less retaliatory."); see also Lindsey v. Burlington Northern Santa Fe Ry. Co., 266 F. Supp. 2d 1338, 2004 WL 443773, at *2 (11th Cir. 2004) ("[I]n the vast majority of cases, a temporary change in work assignments that creates no tangible harm and does not alter the employee's permanent job title is not adverse." (citing Davis, 245 F.3d at 1245)).

[9] Despite the Court's efforts to clarify which of these actions

Page 6 of 23


**1. Monkey Email**[10]

The evidence is undisputed that Burch forwarded the "monkey" email to the entire police department. See Payne Aff. ¶ 11, Ex. 19; see also Motion, Ex. 24: Declaration of Zachary Mears [*14] (Mears Decl.) ¶ 4. Moreover, Burch testifies that he forwarded the email prior to accessing the attachment that contained the monkey image, see Burch Decl. ¶ 21, and this testimony is corroborated by the City's examination of Burch's computer, see Mears Decl. ¶ 4.[11] Davis offers no more than his own rank speculation that Burch would not have forwarded the email without first accessing the contents of the attachment. See Response at 19. Such speculation, in light of the unrefuted evidence, is entirely insufficient to create an issue of fact on this point. See *Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005)* ("Speculation does not create a genuine issue of fact." (internal quotation omitted)). Accordingly, the Court determines that the "monkey" email is neither an adverse action against Davis nor is it evidence of discriminatory intent.

**2. Hours and Duties**

Davis argues that Burch discriminated or retaliated against him by assigning Lieutenant Joe Moody, the junior lieutenant, to a more favorable position with better hours, and fewer duties. See Response at 19-20. However, under the circumstances of this case, Davis fails to show that this conduct amounts to an adverse action. When Burch took over the LCPD, he decided to [*15] reorganize the department. See Burch Decl. ¶ 10. Burch eliminated the second captain position, leaving only one captain, Bruce Charles, and divided the responsibilities of the two lieutenants, Davis and Moody. See id. ¶¶ 10, 14. Burch made each lieutenant a "division commander" with one assigned as the "patrol lieutenant," in command of the patrol teams, the traffic and crime unit, and the school resource unit, and the other as the "services" lieutenant, in charge of the communications, records, investigations, and evidence units, as well as purchasing. See id. ¶ 14. When Burch asked Davis and Moody which assignment they preferred, both officers picked patrol. Id. Because Davis had seniority over Moody, Burch gave Davis his choice and assigned him to be the Patrol Lieutenant. Id.; see

---

Davis contends are discriminatory, retaliatory, or both, as well as which incidents Davis asserts to be independently sufficient to constitute an adverse action under Title VII, as opposed to those actions he maintains are adverse when considered cumulatively, the matter remains unclear. Part of the problem stems from the indiscriminate manner in which Davis' counsel drafted the Amended Complaint. See generally Amended Complaint. In the future, counsel for Plaintiff would be well advised to consider the Eleventh Circuit's admonishment in *Palmer v. Albertson's LLC, 418 F. App'x 885 (11th Cir. 2011)*. See *Palmer, 418 F. App'x at 889* ("Where a plaintiff has alleged a host of claims based on discrete facts of discrimination in just one count, we have noted that the plaintiff failed to comply with *Rules 8* and *10*." (citing *Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 980, n. 57 (11th Cir. 2008)*)); see also *Baker v. City of Safe Harbor, No. 8:07-cv-1120-T-23TGW, 2008 U.S. Dist. LEXIS 125022, 2008 WL 4200147, at *7-8 (M.D. Fla. Sept. 12, 2008)* .

[10] On May 22, 2008, Burch received an email from Rick Davis, the regional director of the Florida Police Chief Association, addressed to all the members of the Association in the region. See Motion, Ex. 22: Declaration of Steven Burch (Burch Decl.) ¶ 20. The subject line stated "Find Your High School Senior Photo" and the message read "I found the neatest site for finding old school photos. Check this out!" See Burch Decl., Ex. 4. Burch forwarded the email to everyone in the police department. Id. The next day, May 23, 2008, Burch sent a second email to the entire staff of the LCPD apologizing for the email. Id., Ex. 6. Burch also apologized verbally that same day, once at a staff meeting and again at a patrol meeting. Id. ¶ 20. Davis did not open the email until "a couple of weeks" later, see Davis Dep. at 172, on June 11, 2008. See Davis Dep. at 437-38. The email directed Davis to a website which instructed him to enter certain personal information and, when he did so, stated that it had found photos of him. See Davis Dep. at 172; Burch Decl. ¶ 20, Ex. 5. Davis clicked on the link to see the photos and a picture of three monkeys appeared with writing at the top saying "we think the one in the middle is you." See Davis Dep. at 172-73. Davis filed an internal complaint against Burch on June 12, 2008, concerning this email. See Payne Aff. ¶ 11, Ex. 18. Payne investigated Davis' complaint and concluded that Burch's act of forwarding the email was not a racially discriminatory or retaliatory event. Id. ¶ 12.

[11] Zachary Mears is the Director of Information Technology for the City and conducted a review of Burch's computer following this incident. See Mears Decl. ¶ 4. Mears' investigation indicated that Burch received the email on May 22, 2008, and forwarded it to the entire staff at the LCPD twenty-six minutes after receiving it. Id. Significantly, Mears found that Burch first opened the attachment in the email on May 23, 2008, at 9:24 a.m., closed it at 9:26 a.m., and then issued an apology email to his staff at 9:30 a.m. See id. Davis offers no evidence to contradict these facts aside from his personal belief that Burch would not have sent out the email without reviewing it first. See Davis Dep. at 438 ("Well, I've never seen somebody send out an e-mail without looking at it first.").

Page 7 of 23


also Davis Dep. at 155. Accordingly, no reasonable person in Davis' position could believe that Burch's decision to assign Davis to the "patrol lieutenant" position was an adverse action as it is the position Davis requested. See *Entrekin v. City of Panama City Fla., 376 F. App'x 987, 995 (11th Cir. 2010)* (reasoning that because a reassignment occurred at the plaintiff's request, it was not an adverse action).

**3. Evidence Key**

Davis next argues that "Burch refused to entrust [Davis] [*16] as the Evidence Custodian with the key to the evidence room. Burch instead gave the key to a subordinate white officer, saying he trusted 'Steve.'" Response at 20. This argument stems from an incident in approximately April of 2008 when Burch made Davis the Evidence Custodian but would not let Davis keep the key to the evidence room. See Davis Dep. at 160. Previously, the evidence custodian was allowed to keep a key to the evidence room. Id. at 161. Burch gave the key to a white officer three ranks below Davis, Steve Shaw, and explained to Davis that he "trust[ed] Steve." Id. Because Davis was the evidence custodian, in order to do his job, he had to go get the key from Shaw every day in order to enter the evidence room. Id. at 449. Davis was not denied access to the evidence room and was allowed to enter the room by himself. Id. After about three weeks of this, Davis brought the issue to Burch's attention and Burch gave the key back to Davis. Id.

At the Hearing, Davis argued that the handling of the evidence key amounts to an adverse action in that it hampered his ability to do his job. However, beyond Davis' personal annoyance at having to retrieve the key from Shaw, Davis presents no evidence that he [*17] was actually impeded in doing his job. See Davis Aff. ¶ 29. For example, Davis relates no occasion where Shaw would not give the key to Davis, where Davis could not locate Shaw, or where he was unable to access the evidence room for any reason. Thus, the Court questions whether a reasonable person under the circumstances would consider three weeks of retrieving the evidence key from Shaw a materially adverse action. Nevertheless, assuming arguendo that Davis can establish a prima facie case of discrimination or retaliation as to this incident, Davis fails to rebut the City's proffered non-discriminatory explanation.

According to Burch, the LCPD was undergoing an audit of its evidence system at that time as part of the process to renew its accreditation. See Burch Decl. ¶ 11. As such, "to secure the integrity of the evidence room," Burch decided to give the key to the evidence room to one person and chose Officer Steve Shaw, the accreditation officer at that time. Id. Burch explains that having the accreditation officer hold the key made sense because he "was not on the road doing patrol and upgrading the evidence system was part of reaccreditation." Id. After the audit process was over, [*18] Burch forgot to return the key to Davis. Id. As Davis concedes, when Davis brought the matter to Burch's attention, Burch readily returned the key to Davis. Id.; Davis Dep. at 162-63; 449. Davis' sole basis for suggesting that the deprivation of the evidence key was retaliatory is the fact that on Burch's first day at the LCPD Burch told Davis that he had read Davis' prior complaints. Davis Dep. at 163-64; Burch Decl. ¶ 29. This evidence does not rebut Burch's legitimate, non-discriminatory explanation for the handling of the evidence key. Indeed, no reasonable juror could conclude from this evidence that Burch's decision to have Shaw keep the evidence key was discriminatory or retaliatory.

**4. Cell Phone Stipend**

Davis maintains that another materially adverse action occurred when Burch "refused to issue [Davis] his stipend designed to compensate for using his personal cell phone for police business." See Response at 20. However, Davis does not contend that Lieutenant Moody or any of the other supervisory staff received a cell phone stipend, and indeed, he concedes that none of the LCPD supervisors received this money. See Davis Dep. at 167 ("I don't know what they were doing with the [*19] staffing pay, but they wasn't [sic] giving it to the supervisors."). Moreover, Davis states that the LCPD supervisors had never received this money. See id. at 167-68 ("They never gave us money. But the City in the budget — if you go back and look — they put the $35 staffing pay in there for supervisors, but it was never paid out to the supervisors. . . . The whole time I was a supervisor I never got any staffing pay.").[12] Thus, failure to pay Davis a cell phone stipend, which no one got and, by his own account, he had never received,

[12] Burch explains that the supervisory staff at the LCPD did not receive this stipend because the staff had previously declined the stipend out of concern that accepting the money would mean their phone records would be public records and because the reimbursement process was tedious. See Burch Decl. ¶ 18. Davis offers no evidence to the contrary.

Page 8 of 23


cannot be considered a "materially adverse" action.

**5. Remaining Allegations**

The remaining purportedly adverse actions taken by Burch consist of the requirement that Davis wear his police uniform to work, Moody's receipt of a new police vehicle before Davis, Moody's assignment to a better office than Davis, and Burch's request that Davis answer the phone in a courteous manner by stating his name and rank. Davis argues that when considered cumulatively, these actions amount to adverse actions sufficient to state a claim for discrimination or retaliation. See Response at 20 n.2. Davis is correct that when deciding whether employment actions are materially adverse, the [*20] court considers the employer's acts both individually and collectively. See *Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998)*; *Davis, 245 F.3d at 1245-46*. For example, in Wideman, the plaintiff received two written reprimands, a suspension, and was listed as a "no-show" on a day she was scheduled to have off. See *Wideman, 141 F.3d at 1455*. In addition, the plaintiff's supervisor began soliciting plaintiff's co-workers for negative comments about the plaintiff, the assistant manager threatened to shoot the plaintiff, and the plaintiff's health was put in jeopardy. Id. The Eleventh Circuit concluded that "the actions about which [the plaintiff] complains considered collectively are sufficient to constitute prohibited discrimination." *Id. at 1456*.

The conduct at issue in this case is altogether different. Davis presents no evidence that he was reprimanded, suspended, threatened, criticized, harassed or in any way tangibly harmed. Davis suffered no loss in pay, benefits, or prestige. Thus, even collectively, these incidents are "highly insubstantial in comparison to the misconduct alleged in *Wideman*." See *Davis, 245 F.3d at 1245-46* (finding no adverse employment action where the plaintiff "was not suspended, was not given a formal reprimand, and suffered little if any of the verbal harassment apparently suffered by the plaintiff [*21] in Wideman"); see also *Akins v. Fulton Cnty., Ga., 420 F.3d 1293, 1301-02 (11th Cir. 2005)* (finding that "unwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of the contracting division, threat of suspension without pay, exclusion from meetings, [and] removal of job duties (followed by reprimands for not completing that work)," considered in the aggregate, are not "adverse" because they did not harm the plaintiffs).[13] Accordingly, the Court finds that Davis fails to present sufficient evidence to state a claim for race discrimination for the conduct occurring under Burch's tenure. See *Davis, 245 F.3d at 1245-46* (finding that "two negative job performance memoranda and the denial on two brief occasions of a favorable work assignment" do not collectively meet the threshold of an adverse employment action); see also *Apodaca v. Sec'y of Dep't of Homeland Sec., 161 Fed. Appx. 897, 899-900 (11th Cir. 2006)*.

Moreover, these petty complaints fail to satisfy the broader "materially adverse" standard applied in retaliation claims. Under Burlington, Davis must show that this conduct, considered cumulatively, is so "materially adverse" that it "might dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington, 548 U.S. at 68*. Notably, the Supreme Court instructs that "[t]he [*22] antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." See *id. at 67*. Davis fails to present any evidence that he was injured or harmed by any of the aforementioned conduct. Even collectively, these actions do not amount to "materially adverse" conduct sufficient to state a claim for retaliation. See *Entrekin v. City of Panama City Fla., 376 F. App'x 987, 995-96 (11th Cir. 2010)* ("[T]he incidents [plaintiff] cites either had no adverse effect on [plaintiff] or constituted mere 'petty slights.' Even if these incidents are viewed collectively, they do not constitute adverse employment actions or a pattern of retaliatory actions, because the collective harm that [plaintiff] suffered from these events, if any, was trivial."). Indeed, the fact that Davis continued to file grievances and EEOC complaints following these alleged acts of retaliation further supports the Court's finding that the above incidents are not sufficiently material. See *Burgos v. Napolitano, 330 F. App'x 187, 190 (11th Cir. 2009)* ("[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy, . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable." (quoting *Somoza v. Univ. of Denver, 513 F.3d 1206, 1214 (10th Cir. 2008)*)); *id. at 191* ("We conclude from the record, however, that [the

[13] Although Akins is a *First Amendment* retaliation case, the standard applied for adverse actions is consonant with the adverse employment action standard used in Title VII discrimination cases such that Akins can inform the analysis here. See *Akins, 420 F.3d at 1301 n.2*; *Stavropoulos v. Firestone, 361 F.3d 610, 619-20 (11th Cir. 2004)* abrogation on other grounds recognized by *Crawford, 529 F.3d at 973-74*.

Page 9 of 23


employer's] [*23] failure to consult [plaintiff's] physician was not a materially adverse action because the evidence shows that [plaintiff] was not deterred in reinstating her EEOC claim."); see also *Tarmas v. Sec'y of Navy, 433 F. App'x 754, 763 (11th Cir. 2011)* ("[P]laintiff has not shown that the email citing poor job performance was a materially adverse action. Receiving this email did not dissuade [Plaintiff] from filing and pursuing his discrimination complaint.").

**B. Selection of Tunsil as Interim Chief in 2008**

Davis argues that, after he filed an internal charge of discrimination against Burch on June 12, 2008, he was "denied the opportunity to serve as Acting Police Chief while Burch served a suspension for his racist monkey email." Response at 22.[14] Following Burch's suspension and resignation, Scott Reynolds, the City Manager at that time, selected Carlton Tunsil, an African American male, who is the fire chief of the Lake City Fire Department, to serve as the interim police chief on a temporary basis. See Motion, Ex. 20: Declaration of Scott Reynolds (Reynolds Decl.) ¶ 16, Ex. 16. Tunsil served as interim chief for about two weeks, beginning July 7, 2008. See Reynolds Decl., Ex. 16; Motion, Ex. 13: Declaration of Carlton Tunsil (Tunsil Decl.) ¶ 5. Davis [*24] asserts that the City violated the LCPD's chain of command policy by selecting the fire chief to serve as the acting chief of the LCPD, instead of Davis, who was the next-highest ranking officer present at the LCPD during that two week period. Response at 22; see Davis Dep. at 181. Although Captain Charles was the next highest ranking officer after Burch, he was on vacation when Burch resigned, leaving Davis, as the most senior lieutenant, next in the chain of command. Reynolds Decl. ¶ 16.

Assuming arguendo that Davis has established a prima facie case of retaliation, Davis fails to show that the City's legitimate, non-discriminatory reasons for selecting Tunsil are pretextual. "'In the context of a promotion, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted.'" See *Bennett v. Chatham Cnty. Sheriff Dep't, 315 F. App'x 152, 162 (11th Cir. 2008)* (quoting *Springer v. Convergys Customer Mgmt. Grp., Inc., 509 F.3d 1344, 1349 (11th Cir. 2007))*. Rather, to demonstrate pretext "[a] plaintiff must show that the disparities between the successful applicant's and [his] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" [*25] See *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006)* (quoting *Cooper v. S. Co., 390 F.3d 695, 732 (11th Cir. 2004))*.

According to Reynolds, he selected Tunsil to serve as the interim police chief because Reynolds had "concerns about both Capt. Charles and Lt. Davis' abilities to lead the department." Reynolds Decl. ¶ 16. Reynolds states that Tunsil "was cross-trained and certified in law enforcement" and "[m]ore importantly, he had years of management experience of a chain of command department." Id. Indeed, Tunsil had "over 20 years of management experience of a Fire Department" and had served as Fire Chief of the Lake City Fire Department since 2006. Tunsil Decl. ¶ 3.

Davis asserts that Tunsil knew "little to nothing about running the Police Department." Davis Aff. ¶ 35. Nevertheless, on the record before the Court, Davis has not met his burden of showing that the disparities between his qualifications and Tunsil's were "so severe that no reasonable person could have chosen [Tunsil] over [him]." *Brooks, 446 F.3d at 1163*. Although Tunsil did not work at the police department, he was cross-trained in law enforcement, and had years of management experience, including approximately two years, at that time, of managing the Lake City Fire Department. See Reynolds Decl. ¶ 16; Tunsil Decl. ¶ 3. Davis, who had been [*26] a lieutenant for approximately three years at that time, did not have equivalent management experience. See Davis Dep. at 49 (stating that Davis was promoted to lieutenant in 2005). Because the City's selection of Tunsil over Davis due to Tunsil's greater management experience was reasonable, Davis cannot demonstrate pretext merely by arguing that Tunsil was incompetent. See *Laosebikan v. Coca-Cola Co., 167 F. App'x 758, 762 (11th Cir. 2006)*. As Davis has not provided sufficient evidence to support a finding that the City's asserted reasons are false or pretextual, the Court concludes that Davis cannot satisfy his burden on summary judgment with respect to this claim.[15]

[14] At the Hearing, Davis clarified that his claim as to this incident is based solely on retaliation, and not race discrimination.

[15] To the extent Davis argues that the City violated the chain of command policy in selecting Tunsil, the Court finds Davis' evidence on this point far too vague and conclusory to support

**C. Captain Bruce Charles**

Captain Bruce Charles served as the officer in charge at the LCPD from August of 2008, until Reynolds named Gary Laxton to be the interim police chief in February of 2009. Charles Decl. ¶¶ 3, 4; Reynolds Decl. ¶¶ 20, 23. During this time, Davis alleges race discrimination and retaliation based on the following actions: (1) requiring Davis to wear a uniform; (2) requiring Davis to submit a leave slip to take holidays off; (3) increasing Davis' work load;[16] (4) allowing another officer to fluctuate his hours but not Davis; [*27] and (5) initiating two internal affairs investigations against Davis. See Response at 23-24. Davis maintains that Lieutenant Moody is similarly situated to him and was not required to wear a uniform, was allowed to take holidays off without submitting a leave slip, had a decreased work load, and was permitted to fluctuate his hours. Id.

Davis cannot establish a prima facie case of retaliation[17] with respect to the two internal affairs (IA) investigations because the mere initiation of an internal affairs investigation against an employee is not a "materially adverse" action. See Rademakers v. Scott, 350 F. App'x 408, 412-13 (11th Cir. 2009) affirming No. 2:07-cv-718, 2009 U.S. Dist. LEXIS 103572, 2009 WL 3459196, at *2, *4 (M.D. Fla. Jan. 22, 2009) ("An investigation into alleged misconduct is not such adverse employment action and cannot support [plaintiff's] retaliation claim."); Rogers v. Ga. Dep't of Corr., No. 5:10-CV-499 (MTT), 2012 U.S. Dist. LEXIS 157309, 2012 WL 5398804, at *7, *11 (M.D. Ga. Nov. 2, 2012) ("[T]he Eleventh Circuit [*28] has held that initiation of an internal investigation against an employee does not constitute an adverse employment action.").[18] Davis does not state that he suffered any reduction in pay or benefits, or that he was otherwise disciplined as a result of these investigations. Notably, Davis was not even aware of the second investigation's

---

a finding of pretext. See Davis Aff. ¶ 35. Davis presents no evidence that Reynolds was required to adhere to the chain of command in selecting an interim chief. See also Springer, 509 F.3d at 1350 (finding that the plaintiff failed to demonstrate pretext, despite evidence that the employer failed to follow its internal promotion procedures, where employer's decision to promote other individual over the plaintiff was reasonable); Houston v. Town of Palm Beach Shores, No. 11-80530-CIV, 2012 U.S. Dist. LEXIS 167146, 2012 WL 5903809, at *7 (S.D. Fla. Nov. 26, 2012) ("[B]ased on the undisputed facts of this case, deviation from the usual hiring practice does not raise a genuine issue of material fact of pretext.").

[16] In his Affidavit, Davis states: "Charles also increased my workload while he lightened Moody's workload. Out of about 65 people who needed supervision between Moody and me, I was required to supervise about 50 of them." Davis Aff. ¶ 37. During his deposition, when questioned on how Charles increased his workload and lightened Moody's, Davis responded:

Because out of roughly around 65 people I had 50 something under me. He only had like 12 under him. Then I had to do all the duties that pertains to them areas. I mean, I was over — everything was under me so to speak. The only thing that was under him was investigation. Then the position of the accreditation manager and the IA guy roughly come up to about 12 people.

> Davis Dep. at 192. Thus, it appears that the difference in the number of people each lieutenant supervised is attributable to their different roles as patrol and service lieutenant. See Burch Decl. ¶ 14. As discussed above, because Davis chose the patrol position, his assignment to that role is not a "materially adverse" action. See supra Part IV.A.2.

[17] To the extent Davis contends that the initiation of the investigation constitutes race discrimination, Davis conceded at the Hearing that an internal affairs investigation is not itself an adverse employment action for purposes of a disparate treatment claim. Moreover, Davis does not demonstrate any similarly situated employee who engaged in similar conduct and was not investigated. Accordingly, Davis fails to state a prima facie case of race discrimination on this basis as well. See McCann, 526 F.3d at 1374-75; Miller-Goodwin, 385 F. App'x at 971-73.

[18] Davis relies on Entrekin for the proposition that "[l]odging internal affairs investigations against a police officer can constitute adverse employment actions." See Response at 24. In Entrekin, the Eleventh Circuit reasoned that two IA investigations, "which ultimately led to [the plaintiff's] placement on administrative leave and termination, appear to rise above 'trivial harms' because it is likely that the initiation of an internal investigation against an employee would dissuade a reasonable worker from making or supporting a charge of discrimination." See Entrekin, 376 F. App'x at 995. Notably, in the same case, the Eleventh Circuit also concluded that another investigation against the plaintiff into a different complaint "did not constitute an adverse action, because the complaint ultimately was not sustained and [plaintiff], therefore, suffered no harm from the filing of the complaint." Id. In light of this distinction, as well as the Eleventh Circuit's finding in Rademakers that an investigation into alleged misconduct is not an adverse employment action, the Court concludes that in the Eleventh Circuit, where an investigation does not cause any harm to the employee, the initiation of the investigation itself does not constitute an adverse action. See Rademakers, 350 F. App'x at 413.

existence until months after Laxton terminated the matter. See Davis Dep. at 241-43; Response, Ex. 75. Accordingly, Davis cannot sustain a retaliation claim based on the two IA investigations, both of which were resolved without any action being taken against Davis, because such conduct does not constitute a "materially adverse" action.

Additionally, the Court determines that no reasonable jury could conclude that the foregoing conduct, even considered cumulatively, is "materially adverse" for purposes of Davis' race discrimination or retaliation claims. See *Entrekin, 376 F. App'x at 995-96*. As with his allegations concerning Burch, Davis does not provide any evidence that he was reprimanded or suspended, received a decrease in pay or benefits, or suffered any loss in prestige. Indeed, Davis does not identify any harm stemming from [*29] Charles' actions. Moreover, as before, these actions did not deter Davis from continuing to file race discrimination and retaliation complaints. Accordingly, the Court concludes that Davis has failed to state a prima facie case of race discrimination or retaliation stemming from the incidents occurring during Charles' tenure as officer in charge.

**D. Selection of Tunsil as Interim Chief in 2009**

In his Response, Davis argues that the City's refusal to appoint Davis as the interim chief following Laxton's departure in June of 2009, was also retaliatory. See Response at 24. However, despite extraordinarily comprehensive factual allegations covering Davis' nineteen year career with the LCPD, the Amended Complaint does not contain any allegations with respect to the selection of Tunsil to act as interim chief following Laxton's retirement in June 2009. See Amended Complaint ¶¶ 25-27. Because Davis failed to allege retaliation based on this incident, he cannot raise this claim now. See *Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)* ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.").

**E. Chief Argatha Gilmore**

Davis contends that Chief Gilmore terminated him in retaliation for his history of [*30] filing race discrimination complaints. See Response at 25-27.[19] Gilmore, an African American female, started as the police chief of the LCPD on September 28, 2009. Gilmore Decl. ¶ 4. Although Davis applied, he was not selected for the chief position. See id. ¶ 8. As the only captain, Davis was the second-in-command at the LCPD when Gilmore arrived. Davis Dep. at 218. Because the LCPD had lost its accreditation prior to her arrival, Gilmore's first priority as the new chief was to obtain re-accreditation. Gilmore Decl. ¶ 10. Part of regaining accreditation called for the redrafting of policies which required "quite a bit of work." Id. When she began at the LCPD, Gilmore would arrive at the office by 6 a.m. and often work until 8 p.m. Id. ¶ 11. At present, she gets to work at 7 a.m. and works until 7 p.m. or later. Id.

During Gilmore's second week as chief, she told Davis that he should meet with her twice a day, once in the morning, and once at 5:00 p.m. See Davis Dep. at 217. Davis was the only person required to meet with Gilmore twice a day. Id. In addition, unlike his prior supervisors, Gilmore would ask Davis what he did the day before and what he was planning on doing that day. [*31] Id. at 219. The requirement that he meet with Gilmore every day at "get off time," as well as the questions about how he spent his days, led Davis to believe that something was wrong. Id. at 217-19. According to Gilmore, she requested that Davis check in with her every day at 5 p.m. in order to "plan for the next day or receive a briefing on pertinent issues from Capt. Davis." Gilmore Decl. ¶ 14. As a "detail oriented manager," Gilmore also requested the meetings because she had noticed that Davis "was not around much at the department . . . that he would leave during the day and [she] would never know where he went or what he was doing." Id. Gilmore observed that Davis seemed "very annoyed" with having the 5:00 p.m. meetings, and she felt that he was "resentful and not supportive." Id.

On October 9, 2009, Davis received the best performance review in his career at the LCPD. See Davis Dep. at 286, 290. The evaluation covered the time period from June 25, 2009, through September 28, 2009. See Tunsil Decl. ¶¶ 6-7, Ex. 1. Fire Chief Carlton Tunsil, who was the interim police chief during that time period, filled out the evaluation form. Id. Gilmore signed this evaluation on October 9, 2009, at the end of

---

[19] Although the basis of Davis' claims as they relate to Gilmore was unclear from his Response, see Response at 25-27, Davis clarified at the hearing that his claim stemming from Gilmore's tenure consists only of the alleged retaliatory termination.

her [*32] second week on the job, with a note stating: "I am looking forward to working with Capt. Davis." See Tunsil Decl., Ex. 1.

After she arrived at the LCPD, Gilmore had a one-on-one meeting with all the sworn officers. Gilmore Decl. ¶ 15. Gilmore's one-on-one meeting with Davis occurred on November 3, 2009, when Gilmore had been with the LCPD for approximately five and a half weeks. Id. In the one-on-one meeting, Gilmore asked Davis what he thought a captain's duties were, and then explained to him the duties she expected her captain to handle. See Davis Dep. at 222, 280-81; Gilmore Decl. ¶¶ 15, 17. Gilmore told Davis that she did not want him to delegate his duties. See Davis Dep. at 281. Davis states that he told Gilmore at the one-on-one meeting that he did not think it was "fair" that he had to attend the 5 p.m. meeting and "stay after work every day." Id. at 282; see also id. at 363 ("I just told her I thought it wasn't fair that I had to meet every day after hours at get-off time.").

During this meeting, it appeared to Gilmore that Davis was "not able to describe a full day of activities and that he was resistant to being supervised on his daily affairs." See Gilmore Decl. ¶ 15.[20] In addition, Gilmore felt [*33] that the activities Davis described in his daily routine "were more closely aligned with the job duties of a Sergeant." Id. Based on their conversation, Gilmore felt that Davis "seemed to have an 8-5 mentality." Id. ¶ 16. In explaining her expectations for a captain, Gilmore told Davis that she "expected him to deal with policies," and that while she did not mind captains going on calls, she did not expect a captain to be on a call for two hours. Id. ¶ 17. It appeared to Gilmore that Davis did not agree with her philosophy. Id.

Following the one-on-one meeting, Gilmore contacted City Manager Wendell Johnson that same day and told him that she had completed a one-on-one meeting with Davis, assessed her command structure and concluded that Davis did not fit into her team. See Johnson Decl. ¶ 14; Gilmore Decl. ¶ 19. Gilmore informed Johnson that she wanted to terminate Davis' employment. Id. Gilmore was preparing to leave on a business trip and Johnson urged her to think about her decision until she returned from the trip. Johnson Decl. ¶ 14. According to Gilmore, Johnson asked her to wait to terminate Davis so that Johnson could have the city attorney's office review the termination. [*34] See Gilmore Dep. at 9. Ultimately, Gilmore decided to terminate Davis' employment. See Gilmore Decl. ¶ 21. Gilmore concluded that Davis "did not understand his role as Captain and he did not possess the skill set [she] was looking for as a Captain." Id. Moreover, Gilmore felt that Davis did not have a "willingness" to allow Gilmore to teach him as his chief. Id. According to Gilmore, Davis was "a doer, not a manager. . . . Managers are not clock watchers. Managers plan, implement policies and take initiative." Id.

Gilmore terminated Davis from the LCPD on November 16, 2009. See id. ¶ 16, Ex. 3. Gilmore did not terminate Davis due to any disciplinary issue. See Gilmore Dep. at 17. On that date, Gilmore called Davis into her office, and gave him the option of either resigning or she would terminate him. Davis Dep. at 290-91. When Davis told her he could not resign without a reason, she handed him a termination letter. See id. at 291; Gilmore Decl., Ex. 3. Prior to terminating Davis, Gilmore was aware that Davis had previously filed EEOC charges, see Gilmore Dep. at 17, although he had not filed any internal grievances or EEOC charges concerning Gilmore or city manager Johnson at that time. See [*35] Johnson Decl. ¶ 13. Gilmore did not fill the vacant captain position until almost a year after Davis was fired. See Gilmore Decl. ¶ 28. On October 1, 2010, Gilmore placed two individuals in the two vacant captain positions, John Blanchard, a white male, and Robert Smith, an African American male.[21] Id.

**1. Prima Facie Case**

To demonstrate a prima facie case of retaliation under Title VII, Davis must show that "(1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." See *Crawford, 529 F.3d at 970*. In this case, there is no question that Davis engaged in protected activity by filing the EEOC charges and that his termination is an adverse employment action. To demonstrate causation, Davis must show that the "alleged retaliator was aware of his

[20] Davis states that when Gilmore would ask him what he planned to do the next day it was "hard to state everything." See Davis Dep. at 219.

[21] Gilmore terminated Smith's employment with the LCPD on April 24, 2012. See Response, Ex. 93: Smith Aff. ¶ 31. Smith has since filed a lawsuit alleging race discrimination, retaliation, and whistle blower retaliation against the City. See Smith v. City of Lake City, No. 3:12-cv-553-99MMH-TEM (M.D. Fla. filed May 9, 2012). The circumstances surrounding Smith's termination are discussed below.

protected activity and the protected activity and the adverse action were not wholly unrelated." See Porter v. Am. Cast Iron Pipe Co., 427 F. App'x 734, 737 (11th Cir. 2011) (internal quotations omitted). It is undisputed that Gilmore was aware of Davis' prior race discrimination complaints when she fired Davis. See Gilmore Dep. at 17. Notably, at the time of his termination, approximately eight months had passed since the City received notice of Davis' last EEOC charge.[22] See Motion, Ex. 2: Payne Aff. ¶ 24. Generally, in the absence of any other [*36] evidence of causation, an eight-month period between the protected conduct and the alleged adverse action is too protracted to infer a causal relation. See Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006). However, the Court must consider the decision-maker's knowledge, not the City's, and as Gilmore was the decision-maker, the close temporal proximity between Gilmore's awareness of Davis' history of complaints and Davis' termination is sufficient to create an inference of causation. See Stone v. Geico Gen. Ins. Co., 279 F. App'x 821, 823-24 (11th Cir. 2008) (finding sufficient temporal proximity where, although the employer knew of the protected activity eight months prior to the termination, the decision-maker learned of the protected activity only one month before terminating the plaintiff's employment). Accordingly, the Court concludes that Davis has established a prima facie case of retaliation. See id.

The City offers a legitimate, non-discriminatory reason for terminating Davis. Specifically, Chief Gilmore explains that she terminated Davis because she felt that Davis did not have a "manager" mentality in that managers are not "clock watchers," rather managers "plan, implement policies and take initiative." See Gilmore Decl. ¶ 21. After assessing Davis' performance, and discussing [*37] his role in the department with him, Gilmore states that she "came to the realization that Capt. Davis did not understand his role as Captain and he did not possess the skill set [Gilmore] was looking for as a Captain." Id. Gilmore concluded that Davis was "functioning in the mentality of a Sergeant or officer," and she did "not see a willingness on Mr. Davis's part to allow [her] to teach him as his Chief. He was a doer, not a manager." Id. In sum, Gilmore concluded that she needed a second in command who could be a "manager," and because Davis had neither the skills to be a manager, nor a willingness to learn from her, she decided to terminate him. Id.

**2. Pretext**

Because the City has offered a legitimate, non-discriminatory reason for Davis' termination, "to avoid summary judgment [Davis] must introduce significantly probative evidence showing that the asserted reason is merely pretext for discrimination."' Bojd v. Golder Assocs., Inc., 212 F. App'x 860, 862 (11th Cir. 2006) (quoting Brooks, 446 F.3d at 1163). "'If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.'" Id. (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079,1088 (11th Cir. 2004)). "[T]he inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the [*38] proffered reason is really a pretext for unlawful discrimination." E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272-73 (11th Cir. 2002) (quoting Burdine, 450 U.S. at 255-56). Moreover, the Court does not sit "as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of an employer's business decisions - indeed the wisdom of them is irrelevant - as long as those decisions were not made with a discriminatory motive." Id. (quoting Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)).

Significantly, "[a]t this stage, the plaintiff's burden of rebutting the employer's proffered reasons 'merges with the [plaintiff's] ultimate burden of persuading [the finder of fact] that [he] has been the victim of intentional discrimination." See Holland, 677 F.3d at 1056 (quoting Burdine, 450 U.S. at 256) (first and second alteration in original). Thus, "the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." Smith, 644 F.3d at 1326. "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. at 1328 (internal quotation and footnote omitted).

As evidence of pretext, Davis relies on the [*39]

[22] Davis filed an EEOC charge naming Charles in January of 2009, but the City did not receive notice of this charge until the following March. See Payne Aff. ¶ 24. Although Davis asserts that he also filed an EEOC charge in July of 2009 concerning former city manager Scott Reynolds, he provides no evidence that the City was aware of this charge. Indeed, the former assistant city attorney Blair Payne, as well as Scott Reynolds, both state that they never received notice of this EEOC complaint. See Payne Aff. ¶ 33; see also Motion, Ex. 20: Reynolds Decl. ¶ 25.

following: (1) the "perfect" evaluation that Gilmore signed; (2) evidence that Davis was regarded as a "good officer"; (3) the City's decision to fire Davis as an "at will" employee; (4) the "inconsistent" treatment of Lt. Joe Moody; (5) the City's "shifting justifications" for Davis' termination based on the EEOC Investigator's Letter of Determination and John Mayo's opinion that Gilmore "started to appear that she was just making things up" when she explained her reasons for terminating Davis; (6) the City's "systemic distaste" for African-Americans as evidenced by the treatment of Tongela Williams, Greg Williams, Robert Smith, Shawn Raggins, and Christopher Hughes; and (7) the "historic pattern of discrimination" against Davis, specifically, Davis' allegations against Allbritton.[23] See Response at 27-30. Despite the quantity of Davis' arguments, after careful consideration, the Court finds that Davis fails to demonstrate an issue of fact with respect to the City's reasons for terminating his employment. For the reasons that follow, the Court finds that the record does not contain such a "convincing mosaic of circumstantial evidence" that a reasonable jury could infer intentional [*40] retaliation by the City. See *Smith, 644 F.3d at 1328*.

### i. The "Perfect" Evaluation

Davis argues that "[i]f Gilmore was so dissatisfied with what she saw in [Davis] to warrant his termination she would not have signed off on his perfect evaluation five weeks earlier." See Response at 27. However, the evidence demonstrates that Gilmore signed the evaluation on October 9, 2009, after working at the LCPD for only two weeks. Gilmore Decl., Ex. 7. By signing the evaluation with the notation "I am looking forward to working with Capt. Davis," Gilmore specifically reflects that she had not yet had the opportunity to evaluate Davis herself. Id. Notably, Gilmore began the 5 p.m. daily meetings with Davis during her second week on the job, and at the time she

---

[23] Davis asserts that the City engaged in "a pattern or practice of giving preference to Caucasian officers." See Response at 17, 18, 29-30. "Statistical evidence is an appropriate method for demonstrating both a prima facie case of discrimination and pretext," however, devoid of any analytical foundation, statistics are "virtually meaningless." See *Brown v. Am. Honda Motor Co., Inc., 939 F.2d 946, 952 (11th Cir. 1991)*; *Kilpatrick v. Tyson Foods, Inc., 268 F. App'x 860, 863 (11th Cir. 2008)*; *Austin v. Progressive RSC, Inc., 510 F. Supp. 2d 855, 864 (M.D. Fla. 2007)*; see also *Williams v. Great-West Healthcare, No. 1:05-CV-2675-RWS-GGB, 2007 U.S. Dist. LEXIS 102129, 2007 WL 4564176, at *6 (N.D. Ga. June 8, 2007)* ("For statistical evidence to be probative, it must be more than anecdotal."). Here, to support his "pattern and practice" assertions, Davis offers nothing more than anecdotal evidence of alleged instances of discrimination against various employees by various supervisors, and general statistical claims devoid of meaningful context. See Response at 17-18 ("With Smith fired, the City has two African-American officers out of about forty-six officers of varying ranks."). Notably, in recounting the foregoing statistics, Davis fails to mention that the LCPD has an additional African American officer, Tongela Williams, who is one of the four officers on reserve. See Gilmore Dep. at 53. Additionally, the City has both an African American police chief (Gilmore) and an African American fire chief (Tunsil).

Davis relies on *Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354 (11th Cir. 1999)* for the proposition that a pattern of conduct is evidence of discrimination. See Response at 29. However, a review of Damon only exemplifies the ways in which Davis' proffered "pattern" evidence is lacking. In Damon, the Eleventh Circuit found a pattern of evidence probative of age discrimination where the same supervisor, during the same time period, fired or demoted four older managers, out of seven total managers under that supervisor's direct supervision, and replaced each one with an employee under the age of forty. *Damon, 196 F.3d at 1361*. In addition, many of these supervisors were demoted or terminated for substantially similar reasons as the plaintiff. *Id. at 1361-62*. In contrast, Davis attempts to show a pattern by relying on instances of purported discrimination or retaliation against officers of varying ranks, by different supervisors, occurring at different time periods, and under a variety of circumstances. See Response at 17-18, 29-30. The Court cannot infer any pattern or practice probative of Gilmore's intent in terminating Davis from this sporadic anecdotal evidence.

Likewise, Davis' contention that various incidents during Allbritton's tenure as chief demonstrate an ongoing "pattern" of discrimination against him is unavailing. These incidents took place years prior to Davis' termination, and involved different circumstances as well as a different police chief and city manager. Thus, even if the Court accepts Davis' contention that Allbritton discriminated against him, these events are not probative of Gilmore's intent in terminating Davis. Moreover, all of these alleged incidents of racial discrimination occurred before Davis filed his first grievance concerning discrimination, and therefore none of this conduct can be construed as retaliatory. See Response at 30 n.11; Payne Aff. ¶ 4. Indeed, Davis was promoted to captain in the spring of 2009 despite having filed three EEOC charges and four internal grievances about race discrimination. Accordingly, Davis' argument that Allbritton's pattern of alleged discrimination against Davis is probative of the City's retaliatory intent with respect to his termination is unavailing.

signed Davis' evaluation, Gilmore had not yet conducted the one-on-one meeting with Davis where they discussed Gilmore's expectations of a captain.

In addition, the fact that Tunsil, the fire chief, who worked with Davis for a limited period of time, on a temporary basis, and allowed Davis to effectively run the LCPD, see Davis Aff. ¶ 47, gave Davis high scores, does not undermine Gilmore's [*41] different conclusions about Davis' abilities. Indeed, "'differences in the evaluation of [a plaintiff's] performance do not establish a genuine issue on pretext. Different supervisors may insist upon different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important.'" See *McCann, 526 F.3d at 1377* (quoting *Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002))*. The evidence reflects that Tunsil did not make the same demands on Davis' time as Gilmore. Davis Dep. at 277-79. Moreover, the evidence shows that Gilmore's expectations of a captain differed from Davis' previous understanding of his duties, thus Tunsil's evaluation of Davis as a captain has no bearing on Gilmore's assessment.[24] See *McCann, 526 F.3d at 1377* (finding that the opinions of plaintiff's former supervisors which do not address the plaintiff's leave and tardiness issues are not evidence of pretext where the unsatisfactory rating given to plaintiff by a new supervisor was based on leave and tardiness issues). Accordingly, Davis' evaluation under Tunsil does not create an issue of fact on pretext.

**ii. Comments that Davis was a "good officer"**

Without citation, Davis argues that he has shown pretext because Davis "was a good officer, by all [*42] accounts." See Response at 27. As discussed above, in the absence of any evidence that his former supervisors and co-workers evaluated Davis with the same standards as Gilmore, these few opinions cannot demonstrate pretext. See *McCann, 526 F.3d at 1377*. Specifically, Davis relies on Laxton's testimony that Davis' work ethic and job performance were good. See Response, Ex. 101: Laxton Dep. at 12-13. Laxton made this analysis based on his observation and supervision of Davis when Davis was a sergeant. Id. at 12. In her explanation of her decision to terminate Davis, Gilmore states that Davis functioned with the mentality of a sergeant. See Gilmore Decl. ¶ 21. Gilmore also observed that Davis' understanding of his job duties was more closely aligned with that of a sergeant than a captain. See id. ¶ 15. Thus, Laxton's view that Davis was a good sergeant does not call into question Gilmore's analysis that Davis did not have the mentality or skills of a captain or manager. Id. ¶ 21.

For the same reason, Gregory Williams' observation that Davis was a "very good supervisor" is not evidence of pretext. See Response, Ex. 103: Deposition of Gregory Williams (G. Williams Dep.) at 5-6. Williams left the LCPD in 2007, when Davis was a lieutenant, and his opinion is based on Davis' willingness [*43] to assist officers when they were on calls. Id. Williams offers no opinion on Davis' ability to "implement policies and take initiative." See Gilmore Decl. ¶ 21. Indeed, Gilmore considered Davis' willingness to go on calls problematic in that, under her philosophy, captains should rarely go on calls and instead should develop policies, plan, direct and supervise. See id. ¶ 17. Last, it appears that Davis is relying on evidence that Gilmore told a newspaper

[24] Notably, Gilmore's concerns about Davis are similar to the observations of Allbritton, Burch and Charles. See Motion, Ex. 12: Declaration of Bruce Charles (Charles Decl.) ¶ 15 ("[D]avis totally distanced himself from anything we were trying to do at LCPD. . . . [H]e was no help to me whatsoever. He did nothing but gripe about what we had to do. When I really need help, Lt. Davis did not step up to the plate and offer to pitch in. He did not cooperate with me at all."); id., Ex. 15: Declaration of Davis Allbritton (Allbritton Decl.) ¶ 14 ("When Mr. Davis did not get his way on an issue his attitude would be very negative. He would simply come to work and do nothing else. He would offer no additional team support but seemed to be only out for himself."); Burch Decl. ¶¶ 9, 31 ("I did not feel that Lt. Davis was very effective or well trained as a lieutenant. For example, I told Davis to develop a plan for patrol officers to do community policing, to deal with noise levels and to do firearm training. He did not seem to be able to accomplish these tasks or even know how to do them. . . . Further, his written memorandums were full of misspelling and syntax errors."). Likewise, Gilmore's feeling that Davis was unsupportive of her is supported by the observations of Officer Stephen Shaw who states that Davis had an "authoritative," "domineering" and "short" attitude toward Gilmore during command staff meetings, and that he would fold his arms in a "defensive posture" and roll his eyes. See Motion, Ex. 21: Declaration of Steve Shaw (Shaw Decl.) ¶ 4. Although Davis believes that he was a good officer, he fails to point the Court to evidence suggesting that the opinions set forth in the Declarations do not accurately reflect the performance assessments of his former supervising officers, or of Officer Shaw. See *Holifield, 115 F.3d at 1565*; *Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332-33 (11th Cir. 1998)* ("The pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs.").

reporter that Davis was a "great officer and had been doing a great job." See Gilmore Dep. at 68. However, Davis presents no evidence concerning the context of this article, or when Gilmore made this statement. Devoid of context, this statement has little persuasive value and is insufficient to create an issue of fact on pretext.

**iii. "At will" Termination**

Davis argues that the City "used the fact that [Davis] was 'at will' to fire him so it could skirt his ability to have the decision reviewed." See Response at 28.[25] Although not specifically articulated, Davis' argument appears to be that the City failed to follow its discipline policies in terminating him at will. See Response at 14-15. Although a plaintiff may establish pretext by [*44] showing that an established progressive discipline policy was not followed in his case, "if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext." See *Ritchie v. Indus. Steel, Inc., 426 F. App'x 867, 873 (11th Cir. 2011)*. Here, the City presents evidence that the City Charter "gives the City Manager the authority to terminate employees or assign that duty to a designee." See Johnson Decl. ¶ 19, Ex. 4. In addition, the portion of the City of Lake City Employee Handbook that governs discipline notes that "the penalty chart is merely a guideline." See Response, Ex. 78 at 15. Davis presents no evidence that the discipline policy is rigorously enforced or that the City Manager never exercises his power to terminate employees at will. Regardless, Gilmore explains that she terminated Davis because he did not possess the skill set she was looking for in her second-in-command, and not due to a discipline issue, see Gilmore Decl. ¶ 21, thus, Davis has not shown that the discipline policy is even applicable to his termination. See Gilmore Dep. at 26-27. Accordingly, the City's decision to terminate Davis as an "at will" employee does not support a finding of pretext.

**iv. Lieutenant** [*45] **Joe Moody's Treatment**

Davis next asserts that Gilmore's treatment of Lieutenant Joe Moody demonstrates pretext. Specifically, Davis contends that Moody also had trouble fitting in with Gilmore's command staff and yet, was demoted, rather than terminated. See Response at 25, 28. Significantly, "even where a plaintiff fails to rebut all of the employer's proffered reasons for taking the adverse action, he may still establish pretext by showing that a similarly situated coworker was treated more favorably." See *Jarvis v. Siemens Med. Solutions USA, Inc., 460 F. App'x 851, 857 (11th Cir. 2012)*; see also *Rojas, 285 F.3d at 1343*. However, a valid comparator is an employee "similarly situated [to the plaintiff] in all relevant respects." See *Rioux v. City of Atlanta, 520 F.3d 1269, 1280 (11th Cir. 2008)* (internal quotations omitted) (alteration in original). While Davis need not show that he and Moody have the same job title, "'material differences' in 'ranks and responsibilities' may render any comparison impossible without 'confusing apples with oranges.'" See *Lane v. McKeithen, 423 F. App'x 903, 906 (11th Cir. 2011)* (quoting *Rioux, 520 F.3d at 1280*). In addition, the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employer's reasonable decisions." See *Rioux, 520 F.3d at 1280* (internal quotations omitted) (alteration in original). Significantly, this Court does "not sit as a super-personnel [*46] department that reexamines an entity's business decisions." See *Chapman, 229 F.3d at 1030*.

Upon review, the Court finds that Moody is not an appropriate comparator. Although "differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared," in this case, rank matters. See *Rioux, 520 F.3d at 1281*. When Gilmore began as police chief, Davis was the only captain on the force and served as Gilmore's second-in-command. See Davis Dep. at 218. In contrast, Moody was one of two lieutenants working on the force at that time. Id. at 267. Thus, although Moody was also a member of Gilmore's command staff, Davis has not shown that his position is properly analogous to the second highest position at the LCPD. As the Eleventh Circuit stated in Rioux, "[i]t cannot be said that conduct that might be tolerated or treated with progressive discipline at lower ranks must

[25] Davis does not elaborate on what he means by his contention that the City somehow avoided having "the decision reviewed" by terminating him at will. Response at 28. Indeed, Davis filed an internal grievance concerning his termination which was reviewed by the city manager, Wendell Johnson, and denied. See Johnson Decl. ¶ 20. As the police chief herself recommended his termination, and the city manager, who is the final decision-maker on the removal of employees, approved it, it is unclear who else could have reviewed the decision. In addition, terminating Davis at will did not hamper his ability to file a complaint with the EEOC or this lawsuit. Regardless, Davis presents no legal authority to suggest that an employer's use of an employee's "at will" status to terminate him demonstrates pretext.

be similarly accepted from the Chief's immediate advisors, who are held to a higher level of professionalism and who are expected to set the standard of conduct for the department." See *Rioux, 520 F.3d at 1281*.

In addition, Moody's performance problems are not similar to the reasons cited for Davis' termination. Significantly, [*47] the "standard for similar conduct is a fairly rigorous one." See *Rioux, 520 F.3d at 1281*. Although Gilmore states that Moody also had problems fitting with her command staff, these problems related to Moody's trouble getting assignments completed, problems with his writing ability, and difficulty in providing timely responses to questions from officers. See Gilmore Dep. at 39-41. Gilmore also disciplined Moody for failing to respond to a citizen's request for assistance. Id. at 41-42. Due to those issues, Gilmore talked to Moody about his performance problems, and wrote him up at least once. See id. at 41-42. However, these issues had nothing to do with whether Moody supported Gilmore, understood his role in the department, or shared her philosophy and vision for the department. The record contains no evidence that Moody complained about working after hours, was unwilling to learn from Gilmore, or did not understand his job duties. Thus, comparing Moody's discrete performance issues with the lack of skills, mind set, or willingness to learn that Gilmore found in Davis, her second-in-command, results in the type of apples to oranges comparison that the Eleventh Circuit cautions against. See *Rioux, 520 F.3d at 1281*. Accordingly, the fact that Gilmore did [*48] not terminate Moody despite his performance problems is not evidence of pretext with respect to Davis' termination.[26]

**v. Shifting Justifications**

Davis next argues that he has proven pretext based on Gilmore's "shifting justifications" for Davis' termination. See Response at 28-29. "[A]n employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." See *Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006)*. However, "the existence of an additional, nondiscriminatory reason is not automatically 'inconsistent' and does not always prove pretext." See *Faircloth v. Herkel Invs., Inc., No. 5:10-cv-352 (CAR), 2012 U.S. Dist. LEXIS 80475, 2012 WL 2119083, at *10 (M.D. Ga. June 11, 2012)* (quoting *Tidwell v. Carter Prods., 135 F.3d 1422, 1428 (11th Cir. 1998)*). Indeed, "the fact that the employer offers an additional reason for the employment decision does not suggest pretext if both of the employer's reasons are consistent." See *Ritchie, 426 F. App'x at 872*. Moreover, an employer's further elaboration of a general reason is not evidence of pretext. See *Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332 (11th Cir. 1998)*.

Here, the City has consistently stated that Davis was not terminated pursuant to any misconduct or disciplinary issue. See Gilmore Dep. at 62; Gilmore Decl. ¶ 21; Johnson Decl. ¶ 15; Response, Ex. 84. Davis attempts to demonstrate inconsistency in the City's reasons for terminating Davis by relying [*49] on statements attributed to the City in the EEOC's Letter of Determination. See Response, Ex. 80. In this letter, the investigator states that "the Respondent admitted that the Charging Party was terminated for being an insubordinate subordinate." See id., Ex. 80 at 2. However, upon review, the Court concludes that this conclusory statement does not demonstrate that the City has relied on inconsistent reasons for terminating Davis. First, in the EEOC letter, the investigator does not offer any details as to the identity of the City representative who "admitted" that Davis was terminated for being an "insubordinate subordinate." See id., Ex. 80 at 2. Moreover, the letter does not explain what conduct constituted the "insubordination," and whether the "Respondent" used the term insubordination, or whether the EEOC investigator drew that conclusion based on the conduct that the "Respondent" described. Id. Indeed, although Gilmore does not use the term "insubordination" to describe Davis' conduct, she concedes that whether Davis' conduct amounted to insubordination was a matter of interpretation. See Gilmore Dep. at 28. Indeed, when Gilmore explained her reasons for firing Davis to John [*50] Edwards, a local pastor, he interpreted from what she said that Davis was fired for insubordination. See Motion to Strike, Ex. 1: Deposition of John Edwards

---

[26] Davis' arguments with respect to Moody's demotion are without merit. It is undisputed that Moody requested a demotion because he no longer wanted to work as a lieutenant and was concerned about his health. See Motion, Ex. 19: Declaration of Joe Moody (Moody Decl.) ¶ 4; Response, Ex. 104: Moody Dep. at 14-15; Gilmore Decl. ¶ 26, Ex. 5; Gilmore Dep. at 39-40. Davis presents no evidence that Moody's decision to voluntarily demote was connected to his performance problems. Indeed, Davis has not offered any example of an officer who was demoted for disciplinary reasons at the LCPD.

(Edwards Dep.) at 12-13.[27] Thus, Davis has not shown that Gilmore's reasons for terminating Davis are inconsistent with a statement that he was insubordinate. The fact that the same conduct can be characterized in different ways does not demonstrate pretext.

Indeed, Gilmore and Johnson have consistently explained that Davis was terminated because he was not a "team player," did not support Chief Gilmore, did not share her same philosophy and vision for the LCPD, and did not have the right skills or mentality to serve in a command staff position under Gilmore. See Gilmore Decl. ¶ 21; Johnson Decl. ¶ 16; Response, Ex. 98: Deposition of Wendell Johnson (Johnson Dep.) at 18-20; Edwards Dep. at 8-10, 14. Although John Mayo, president of the NAACP in Columbia County, states that in a meeting with Gilmore it appeared to him that in explaining her reasons for terminating Davis Gilmore was "making it up as she went along," Mayo's recollection of Gilmore's explanation is also consistent with the foregoing. See Response, Ex. 87: Mayo Stmt. at 4, 11-13. Specifically, [*51] Mayo recalls Gilmore mentioning disagreements between her and Davis regarding the scope of his duties, her difficulty in locating Davis during the day, and her opinion that Davis did not seem to want to listen to her. See Mayo Stmt. at 11-12. Thus, Davis fails to show any inconsistency in the City's stated reasons for terminating Davis.

**vi. "Me Too" Evidence**

Finally, Davis contends that evidence of purported retaliation against other African American members of the LCPD, after those officers reported or objected to racism, also demonstrates that the City's reasons for Davis' termination are pretextual. See Response at 29-30. Specifically, Davis asserts that Tongela Williams, Greg Williams, Robert Smith, Shawn Raggins, and Christopher Hughes were also victims of discrimination and/or retaliation at the LCPD. See id. In the Motion to Strike, the City argues that this evidence should be stricken because Davis has failed to establish that these other employees were similarly situated to Davis. See Motion to Strike at 4.[28]

In *Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1286 (11th Cir. 2008)*, the Eleventh Circuit considered, inter alia, whether evidence of discrimination or retaliation against a plaintiff's co-workers, known as "me too" evidence, can be admissible under [*52] *Rule 404(b), Federal Rules of Evidence (FRE)*, to prove the intent of a decision-maker to discriminate and retaliate. See *Bagby, 513 F.3d at 1286*. Under the circumstances in Bagby, the Eleventh Circuit found that such evidence was admissible, reasoning that:

> [The plaintiff] and coworkers Jemison and Thomas were discriminated against by the same supervisor, Farley, so the experiences of Jemison and Thomas are probative of Farley's intent to discriminate. Steber was involved in the termination decisions of all four individuals, so the experiences of Jemison, Peoples, and Thomas are probative of Steber's intent.

See *Bagby, 513 F.3d at 1286*. Accordingly, a plaintiff may use "me too" evidence under *FRE 404(b)* as evidence of intent in a discrimination or retaliation case. *Demers v. Adams Homes of NW Fla., Inc., 321 F. App'x 847, 854 (11th Cir. 2009)* ("We have approved the use of 'me too' evidence under *F.R.E. 404(b)* in discrimination and retaliation cases."); *Smith, 644 F.3d at 1341*; *Moyes v. Keiser Sch., Inc., No. 4:09-CV-334-SPM/WCS, 2010 U.S. Dist. LEXIS 102810, 2010 WL 3833959, at *7 (N.D. Fla. Sept. 28, 2010)* ("Corroborative or 'me too' evidence is admissible to prove the intent of an employer to discriminate and retaliate."); see also *Fudali v. Napolitano, 283 F.R.D. 400, 403 (N.D. Ill. 2012)* ("The cases are basically uniform in holding as a general principle that

---

[27] In the Response, Davis includes only an excerpt of John Edwards' deposition. See Response, Ex. 95. The City attaches the entire deposition to its Motion to Strike and thus, citations to the Edwards Deposition refer to that document. See Motion to Strike, Ex. 1.

[28] The City also objects to this evidence because Davis presents: "No citation. No foundation. No indication of decision-maker in each employee's situation. No time frame given." See Motion to Strike at 12. In his Response to the Motion to Strike, Davis argues that "[n]o citation is needed as this is argument and based on record evidence offered from each of the other African American employees who was subjected to the same type of discriminatory and retaliatory treatment as the Plaintiff." See Response to Motion to Strike at 14. Although the Court does not condone the conclusory manner in which Davis drafted this portion of his Response, because the Court can nevertheless discern the specific evidence on which Davis relies, the Court will not strike this evidence for lack of citation. See Response at 16-18.

discriminatory intent or the pretextual nature of an employment related decision may be proven by 'other acts' of discrimination or retaliation.") (collecting cases).

However, [*53] whether such evidence is relevant "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." See Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 388, 128 S. Ct. 1140, 170 L. Ed. 2d 1 (2008). For example, in Lewis v. Dep't of Transp., 187 Fed. Appx. 961, 961-62 (11th Cir. 2006), the Eleventh Circuit found that a district court did not abuse its discretion in excluding "me too" evidence where the plaintiff asserted a failure to promote claim and the alleged prior instances of discrimination involved different decision-makers and different types of discrimination (hostile work environment and retaliation) such that "the evidence was likely to confuse the issues for the jury and unfairly prejudice the defendants." See Lewis, 187 Fed. Appx. at 961-62. Although courts frequently focus on whether the same person made each of the allegedly discriminatory decisions, Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1236 (S.D. Ala. 2012) ("To be probative, the other incidents must involve a common decisionmaker."), the Supreme Court instructs that courts should not apply a per se rule excluding such evidence where different decision-makers are involved. See Mendelsohn, 552 U.S. at 388. Rather, in determining the relevance of "me too" evidence courts consider other factors such as: "whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, whether the same [*54] decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated." See Nuskey v. Hochberg, 723 F. Supp. 2d 229, 233 (D.D.C. 2010); see also Griffin v. Finkbeiner, 689 F.3d 584, 599 (6th Cir. 2012) (listing relevant factors "such as temporal and geographical proximity, whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of retaliation").

With respect to the alleged incidents of discrimination against Tongela Williams, Greg Williams, and Shawn Raggins, Davis fails to show that this evidence is closely related to Davis' circumstances or the theory of his case. First, the purported discrimination or retaliation against Tongela Williams, Greg Williams, or Shawn Raggins did not involve Gilmore as police chief or Johnson as city manager.[29] See Response, Ex. 94: Deposition of Tongela Williams (T. Williams Dep.) at 10-12 (testifying that the incident regarding her request to work part-time occurred under Charles and Reynolds); id., Ex. 88: Statement of Shawn Raggins (Raggins Stmt.) at 4-6 (explaining that he was terminated when Laxton was interim police chief and Grayson Cason[30] was interim city manager); G. Williams Dep. at 6 (stating [*55] that he left the department in 2007). In addition, none of these individuals assert that they were fired in retaliation for their complaints of discrimination. See T. Williams Dep. at 10-12 (asserting that she was required to remove her corporal stripes in retaliation for complaining that a white officer was allowed to work part-time while she was not); Raggins Stmt. at 4,7, 9-10, 11-12 (stating that he was not allowed to rescind his resignation in retaliation for his prior complaints that he was passed over for promotions, and that his office was moved to the first floor); G. Williams Dep. at 6, 8 (testifying that he did not receive the pay raise to which he was entitled until Davis complained, and that a white officer with less seniority was promoted over him). Notably, Greg Williams does not testify that he was retaliated against at all, and only suggests that the failure to promote him and failure to give him a pay raise might have been racism. See id. at 8 ("Q. Okay. Did you think that that was racist? A. If I had been a bad man, I'd say it was. . . . So I said something happened. I don't know what happened, but I didn't get [the promotion.]"). While Tongela Williams and Raggins both assert that they were retaliated [*56] against after filing charges of discrimination, the circumstances surrounding these incidents lack any similarity or connection to Davis' claims, and as such, are not probative of the City's intent in terminating Davis.[31] See Lewis, 187 Fed. Appx.

---

[29] In Davis' Response to the Motion for Summary Judgment, he asserts that Raggins was terminated by Gilmore. See Response ¶ 45. Davis concedes in his Response to the Motion to Strike that Raggins was terminated before Gilmore arrived. See Response to Motion to Strike at 14.

[30] The identity of the "Grayson Cason" referred to in Raggins' Deposition is unclear. The timing of Raggins' resignation suggests that Dave Clanton would have been serving as the interim city manager at that time. Motion, Ex. 14: Clanton Decl. ¶ 4.

[31] According to Tongela Williams, Charles told her she could not work part-time because there was no money in the budget for it, when, at the same time, a white officer was working part-time hours. See T. Williams Dep. at 10-11. Williams filed a grievance about this with Reynolds, and six months later the LCPD allowed her to work part-time. Id. at 11-12. However,

at 961-62; Bell, 844 F. Supp. 2d at 1236; Houston, 2012 U.S. Dist. LEXIS 167146, 2012 WL 5903809, at *7 ("Plaintiff cannot point to the Town's allegedly racist environment and conclude that the person responsible for hiring her made that decision for a racist reason. Rather, Plaintiff must show a connection between the allegedly racist environment and the decisionmaker."); Williams, 2007 U.S. Dist. LEXIS 102129, 2007 WL 4564176, at *6.

Davis also relies on the termination of Christopher Hughes, another African American officer. Although Gilmore and Johnson were the decision-makers in Hughes' termination, the only evidence before the Court concerning the matter is the affidavit of a different officer, Robert Smith, who states that Hughes filed a complaint of race discrimination during his employment with the LCPD and was fired thereafter. See Smith Aff. ¶ 33. In addition, Johnson testified that he signed off on Hughes' termination and that he consulted with the city attorney about Hughes' termination. See Johnson Dep. at 38. Hughes has filed a complaint of race discrimination and retaliation which [*57] is currently pending in this Court. See Hughes v. City of Lake City, No. 3:12-cv-158-J-32JBT (M.D. Fla. filed Feb. 14, 2012).

However, Davis fails to present any affidavit or testimony from Hughes regarding his termination. Indeed, Davis presents no evidence regarding the circumstances of Hughes' termination, what rank Hughes held with the LCPD, the context of his complaint concerning race discrimination, the time period between when Hughes complained about discrimination and when he was terminated, or any other details to suggest that Hughes was in fact retaliated against, or that he is in any way similarly situated to Davis. As such, the mere fact that Hughes filed a complaint, was ultimately terminated, and then filed a lawsuit has little probative value and is not evidence of pretext with respect to Davis' termination. See Davis v. Dunn Constr. Co., Inc., 872 F. Supp. 2d 1291, 1318 (N.D. Ala. 2012) (analyzing "me too" evidence by considering whether the allegations of discrimination are close in time to the plaintiff's, whether the other employees alleging discrimination had similar job positions as the plaintiff, whether they were demoted or terminated for reasons similar to the defendant's proffered reason for demoting the plaintiff, and whether there [*58] was a common decision-maker); Jones v. St. Jude Med. S.C., Inc., 823 F. Supp. 2d 699, 734 (S.D. Ohio Sept. 29, 2011) (explaining that "me too" evidence is probative only where the plaintiff can show that the evidence is "logically and reasonably tied to [his] specific adverse employment actions because the same actors, reasons, and circumstances were involved"); Megivern v. Glacier Hills Inc., No. 11-10026, 2012 U.S. Dist. LEXIS 20749, 2012 WL 529977, at *19-20 (E.D. Mich. Feb. 17, 2012) (finding that affidavits of plaintiff's co-employees regarding instances of alleged discrimination not sufficient to demonstrate pretext because they "do not describe situations 'closely related' enough to [p]laintiff's 'circumstances and theory of the case' to carry her past summary judgment").

Last, Davis relies on the termination of Robert Smith, an African American male, who worked as a captain at the LCPD, complained of race discrimination and was terminated thereafter.[32] See Response at 16, 29-30.

---

her supervisor, Robert Mulligan, required her to remove her corporal stripes. See id. at 11-12. Williams states that in response she told her supervisor that she would not remove her stripes. Id. at 12. Williams does not explain whether she ultimately removed her stripes or not. Id. Williams presents no other details or evidence to suggest that Mulligan's request was retaliatory besides her own personal feeling that he was retaliating against her for filing the grievance. Id. Davis fails to demonstrate any connection between the foregoing incident, involving different actors and different circumstances, and his termination approximately ten months later.

Raggins asserts that he filed an EEOC complaint of discrimination "in the last part of 2008" "shortly after" the "monkey" email incident. See Raggins Stmt. at 6-7, 12-13. In March of 2009, the LCPD started an internal investigation concerning Raggins. Id. at 4. Raggins decided to resign in April of 2009 after being threatened with termination. Id. At some point thereafter, Raggins sought to rescind his resignation but interim city manager Cason and police chief Laxton would not allow him to do so. Id. at 4-5. Although the timing is unclear, it appears Raggins then filed a retaliation complaint following his "termination." Id. at 6-7. Given the lack of any temporal proximity between his complaint regarding the "monkey" email and the initiation of the internal investigation, these allegations fail to demonstrate retaliation. Moreover, the contention that Laxton refused to let him rescind his resignation in retaliation for his prior complaints of discrimination is particularly unpersuasive given that Laxton is the same police chief that promoted Davis to captain following Davis' EEOC complaints against Charles in January. Regardless, as with Williams, Davis draws no connection between these circumstances and the decision to terminate him.

[32] In brief, the evidence before the Court concerning Smith shows that Smith began working at the LCPD on October 11, 2010. See Smith Aff. ¶ 1. During the course of this litigation,

Unlike Raggins, Greg Williams, Tongela Williams, and Hughes, Smith is similarly situated to Davis in a number of relevant respects. Both Smith and Davis were captains at the LCPD and terminated under Gilmore and Johnson. In addition, prior to their terminations, both Smith and Davis had internally complained about allegedly discriminatory conduct at the LCPD, and both Smith and Davis had filed EEOC complaints against [*59] the City. Thus, the City's argument that the Court should not consider this evidence because Smith is not "similarly situated" to Davis, see Motion to Strike at 4, is unavailing. See *Goldsmith, 513 F.3d at 1286*; *Demers, 321 F. App'x at 854* (stating that in Goldsmith, the Eleventh Circuit determined that "evidence from four employees, each of whom was discharged in circumstances very different from the plaintiff's," was admissible under *FRE 404(b)* in order to, among other things, demonstrate the racial intent of the common decision-maker).

As such, the Court next considers whether this "me too" evidence satisfies Davis' burden to demonstrate an issue of fact on pretext. Significantly, Davis presents no case in which "me too" evidence was itself found sufficient to establish pretext in order to avoid summary judgment under the *McDonnell Douglas* framework. See Response at 29-30; Response to Motion to Strike at 13-14; see also *Megivern, 2012 U.S. Dist. LEXIS 20749, 2012 WL 529977, at *20* (noting that the plaintiff did not provide, nor could the court discover, any Sixth Circuit case where "me too" evidence carried a plaintiff's burden of showing pretext).[33] Regardless of whether such evidence can ever be sufficient on its own, the Court finds [*60] that under the circumstances of this case, Davis' "me too" evidence fails to satisfy his burden. Stated another way, "the record, viewed in a light most favorable to the plaintiff," does not present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional [retaliation] by the decisionmaker." See *Smith, 644 F.3d at 1326, 1328* (internal quotations omitted).

In this case, Gilmore has consistently explained that she terminated Davis because he did not have the right mentality and skill set to serve as her second-in-command. Davis has not shown that these reasons are untrue, or that they could not have legitimately motivated Gilmore to terminate Davis. Davis offers no evidence to contradict Gilmore's belief that Davis had an 8 to 5 mentality, and indeed Davis concedes that he complained about the 5 p.m. meetings to Gilmore. See Davis Dep. at 268, 282, 363. In addition, Davis does not present any evidence that rebuts Gilmore's explanation that Davis did not have the right mentality or skill set to perform the role of captain. Gilmore Decl. ¶ 21. Although Davis presents some evidence that he was regarded as a good officer and supervisor, see supra Part IV.E.2.ii., this evidence [*61] does not undermine Gilmore's

Gilmore and Johnson learned that Smith had met with Davis, and that Davis had subpoenaed Smith to appear for a deposition. See Davis Dep. at 222-28; Smith Aff. ¶ 5. Upon learning this information, Johnson met with Smith on November 2, 2011. See Smith Aff. ¶¶ 5-6. At this meeting, Smith informed Johnson that he felt that he had been subject to disparate treatment due to his race. Smith Aff. ¶ 6. Gilmore sent an email to Smith addressing the issues that he had discussed with Johnson and instructing him to inform her of all the circumstances in which he perceived that he was treated unfairly. Id. In response, Smith wrote a letter of complaint to Gilmore communicating his "perception of being targeted for unfair treatment and retaliated against," and then, at Gilmore's request, provided her with a detailed written list "of the events of disparate treatment." Id. ¶¶ 8-9. On November 15, 2011, Smith was put on administrative leave with pay and told that the City was investigating the truthfulness of his allegations. Id. ¶ 11. On December 12, 2011, Gilmore, Johnson and Gene Bullard, the City's Human Resources Director, met with Smith and told him that there was just cause for investigating him. Id. ¶ 12. Johnson then continued the investigation and Smith's administrative leave. Id. On December 14, 2011, Smith filed an EEOC charge against the City naming Gilmore and Johnson. Id. ¶ 13. The following day, Gilmore turned over the internal affairs investigation of Smith to the Internal Affairs Department of the Gainesville Police Department (GPD). Id. ¶ 14. Ultimately, on April 24, 2012, Gilmore fired Smith for failure to follow the direct order that he appear for an interview with the investigator from the GPD. Id. ¶ 31. Smith maintains that he did not refuse to comply with Gilmore's order but rather opposed Gilmore's extension of the investigation beyond the forty-five day deadline for completing such investigations set forth in the City's policies. Id. ¶¶ 16, 19-30. Smith maintains that Gilmore's attempt to extend the investigation was invalid because she did not specify the length of the extension and the reasons therefor as required by the City's policies. Id. On May 9, 2012, Smith filed a lawsuit against the City for race discrimination, retaliation and whistleblower retaliation. See Complaint (Doc. 1), Smith v. City of Lake City, Fla., No. 3:12-cv-553-J-99MMH-TEM (M.D. Fla. filed May 9, 2012).

[33] The Court found no Eleventh Circuit case where a plaintiff relying solely on "me too" evidence was found to raise a reasonable inference of discrimination or retaliation sufficient to survive summary judgment. Although in Moyes the court referred to the plaintiff's "me too" corroborative evidence as the "most compelling argument for pretext," the record contained other evidence calling into question the employer's justifications for its actions as well. See *Moyes, 2010 U.S. Dist. LEXIS 102810, 2010 WL 3833959, at *7, *9*.

assessment that Davis was operating with the mentality of a sergeant, meaning, he may have been good at providing supervision, but he was not skilled at planning, drafting policies, or taking initiative. See Gilmore Decl. ¶¶ 15, 21.

Likewise Gilmore's observation that Davis would frequently be out of the office during the day is supported by Davis' own testimony that he "did spend a lot of time" at Simon's Car Wash. See Gilmore Decl. ¶ 14; Davis Dep. at 351; see also Charles Decl. ¶ 16 ("Lt. Davis had a long time habit of spending a lot of time down at Simon's Car wash when he was on duty."). Davis explains that he was "talking to people in the community" because "[s]ometimes you can find out information on cases and different things just by listening to people talk." Davis Dep. at 351. While Davis may have regarded this time as legitimate information gathering, it nevertheless supports Gilmore's observations and belief that Davis' understanding of a captain's duties differed from hers. See Gilmore Decl. ¶ 15 ("A second in command or Captain is a position that is responsible for planning, forecasting, delegating, direction operations, resource gathering [*62] administering and oversight of policies and procedures."). Moreover, Davis' reliance on the termination of Smith does not rebut the City's justifications for firing Davis. Smith was fired under entirely different circumstances than Davis such that even if Davis could demonstrate that Smith's termination was retaliatory, it does not then follow that the reasons given for Davis' termination are pretextual. Cf. *Smith, 644 F.3d at 1341*. Accordingly, Davis has failed to show any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the City's] proffered legitimate reasons for its actions [such] that a reasonable factfinder could find them unworthy of credence." *Alvarez, 610 F.3d at 1265* (internal quotations omitted).

Rather, the evidence of Smith's termination is relevant to whether retaliation was more likely to have motivated Gilmore and Johnson than the proffered reasons. See *Alvarez, 610 F.3d at 1266* ("[The plaintiff] may satisfy [his] burden either by offering evidence that [the defendant] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible . . . ."). While the circumstances leading to Smith's termination are admissible evidence of intent, see *Bagby, 513 F.3d at 1286*, this evidence is [*63] insufficient based on the record in this case to raise a reasonable inference of retaliation. See *Bell, 844 F. Supp. 2d at 1236* ("Even when offered to show pretext rather than a prima facie case, 'me, too' evidence is suspect."); *Chieke v. Pa. Dep't of Welfare, No. 1:CV-06-1294, 2008 U.S. Dist. LEXIS 18320, 2008 WL 686911, at *8 (M.D. Pa. Mar. 10, 2008)* ("Without any other circumstantial evidence of discriminatory intent by [the decision-maker], the allegations of [the decision-maker's] mistreatment of others, on their own, are insufficient to meet [plaintiff's] burden of showing pretext by a preponderance of evidence."); *Dunn Constr. Co., Inc., 872 F. Supp. 2d at 1313* (finding that the plaintiff's circumstantial evidence, which included unconfirmed, inconclusive allegations of race discrimination and retaliation, pales in comparison to the extensive record in Smith, and is not sufficient to raise an inference of discrimination); *Houston, 2012 U.S. Dist. LEXIS 167146, 2012 WL 5903809, at *9*; see also *Denney v. City of Albany, 247 F.3d 1172, 1189-90 (11th Cir. 2001)* ("[C]ourts are reluctant to consider 'prior bad acts' in this context where those acts do not relate directly to the plaintiffs.")[34]; *Troupe v. May Dep't Stores Co., 20 F.3d 734, 737 (7th Cir. 1994)* (characterizing evidence of an employer's discrimination against other employees as a piece of evidence not "conclusive in itself but together [with other evidence] composing a convincing mosaic of discrimination"). First, the evidence of any causal connection between Davis' [*64] complaints and his termination is weak. Davis had not made any complaints against Gilmore or Johnson at the time of his termination, and had not filed an EEOC Complaint against the City in nine months. Every individual named in Davis' prior EEOC charges had

---

[34] In Denney, the Eleventh Circuit considered whether evidence that a supervisor had discriminated in a previous promotion decision was sufficient to "push the Plaintiffs past summary judgment" in a challenge to a different promotion decision by the same supervisor. *Denney, 247 F.3d at 1189-90*. Notably, the evidence in that case consisted of an actual court finding in a previous lawsuit that the employer had engaged in racial discrimination. Id. In the Denney case, the court noted that the previous case, which occurred two years prior to the matter before the court, involved different applicants and a different selection process, but that, in both cases, the same actor was involved in making the same type of personnel decision. *Id. at 1189*. The court concluded that despite the similarities, "the distinctions are important, and weigh heavily against attaching a great deal of probative value" to the prior case. Id. Here, although Smith's termination occurred after Davis', the Court finds *Denney* persuasive authority that Smith's allegations of retaliation, despite the similarities to Davis' claims, are not sufficient under the circumstances of this case to push Davis past summary judgment.

retired, resigned or otherwise left the City's employment by the time of Davis' termination. In addition, Davis was promoted to the rank of captain in the spring of 2009, despite having filed four EEOC charges against the City. Gilmore had no connection to the LCPD prior to her selection as the new police chief, and she did not know any of the people about whom Davis had previously complained. See Gilmore Decl. ¶ 6. Although Davis argues that the City hired Gilmore with the precondition that she fire him, Davis presents absolutely no evidence to support this suggestion. See Response at 26. Given the unrebutted evidence that Davis did not have the skill set or mentality that Gilmore was looking for in a captain, a reasonable juror could not infer that Gilmore more likely terminated Davis in retaliation for his prior complaints of race discrimination based solely on evidence that, two years later, Gilmore initiated an internal investigation [*65] and ultimately terminated another African American police captain for refusing to participate in that investigation, after that captain also complained of disparate treatment. Even assuming that Smith's termination was retaliatory, in light of the foregoing, Smith's termination, standing alone, fails to demonstrate the type of "convincing mosaic of circumstantial evidence" sufficient to permit an inference of discrimination. See *Smith, 644 F.3d at 1328, 1341-47*.

**V. Conclusion**

Despite the sheer number of allegations and accusations of race discrimination and retaliation included in Davis' Amended Complaint, careful consideration of the record evidence reveals that Davis has failed to satisfy his burden on summary judgment as to any of his claims. The vast majority of Davis' complaints are wholly without merit in that Davis suffered, at most, only trivial harm from the conduct alleged, or because Davis presents no evidence that the conduct was motivated by a discriminatory or retaliatory intent. Although Davis' termination presents a closer question, the Court is convinced that no reasonable juror could infer a retaliatory motive based on the record before this Court. In light of the foregoing, [*66] the City's Motion for Summary Judgment is due to be granted in its entirety. Accordingly, it is

**ORDERED**:

1. Defendant's Motion for Summary Judgment (A Dispositive Motion) with Supportive Memorandum of Law (Doc. 42) is **GRANTED**.

2. Defendant's Motion to Strike False and Inadmissible Evidence Contained in Documents Filed by Plaintiff in Opposition to Defendant's Motion for Summary Judgment (Doc. 53) is **DENIED**.

3. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant City of Lake City, Florida and against Plaintiff Rudolph Davis, Sr.

4. The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on March 15, 2013.

/s/ Marcia Morales Howard

**MARCIA MORALES HOWARD**

United States District Judge

---

End of Document