# Goldsmith v. Bagby Elevator Co.

United States Court of Appeals for the Eleventh Circuit

January 17, 2008, Decided; January 17, 2008, Filed

No. 06-14440

**Reporter**
513 F.3d 1261 *; 2008 U.S. App. LEXIS 979 **; 102 Fair Empl. Prac. Cas. (BNA) 716; 90 Empl. Prac. Dec. (CCH) P43,077; 75 Fed. R. Evid. Serv. (Callaghan) 601; 21 Fla. L. Weekly Fed. C 316

GREG GOLDSMITH, Plaintiff-Appellee, versus BAGBY ELEVATOR COMPANY, INC., Defendant-Appellant.

**Subsequent History:** Rehearing denied by, Rehearing, en banc, denied by *Goldsmith v. Bagby Elevator Co., 2008 U.S. App. LEXIS 28211 (11th Cir. Ala., Mar. 31, 2008)*

**Prior History:** [**1] Appeal from the United States District Court for the Northern District of Alabama. D. C. Docket No. 03-01018-CV-2-IPJ.

*Goldsmith v. Bagby Elevator Co., 2005 U.S. Dist. LEXIS 51726 (N.D. Ala., Dec. 23, 2005)*

**Counsel:** For Bagby Elevator Company, Inc., Appellant: Walker, Marion F., Ford & Harrison LLP, BIRMINGHAM, AL.

For Appellant: Stastny, Steven Michael, Ford & Harrison, LLP, BIRMINGHAM, AL.

For Goldsmith, Greg, Appellee: Wilkinson, Cynthia Forman, Wilkinson Law Firm, PC, BIRMINGHAM, AL.

For Appellee: Mann, Larry R., Law Office of Larry Mann, BIRMINGHAM, AL.

**Judges:** Before MARCUS and PRYOR, Circuit Judges, and LAND, * District Judge.

**Opinion by:** PRYOR

## Opinion

[*1267] PRYOR, Circuit Judge:

Forty-five years ago, "the civil rights movement swirled into Birmingham, a city whose bitter resistance to change made it a battleground." Jack Bass, Unlikely Heroes 201 (1981). Dr. Martin Luther King Jr. remarked, "If we can crack Birmingham, I am convinced we can crack the South. Birmingham is a symbol of segregation for the entire South." Id. By blood, toil, and tears, segregation was, of course, cracked in Birmingham, and today the city is led by its fourth black mayor and a majority-black city council. Against this historical backdrop, this appeal from the Northern District of Alabama offers, amid a host of technical issues, an important reminder: despite considerable racial progress, racism persists as an evil to be remedied in our Nation.

The main issue in this appeal is whether Bagby Elevator Company was entitled to a judgment as a matter of law against Greg [**2] Goldsmith's claim of retaliation when it is undisputed that Goldsmith's employment was terminated based on his refusal to sign a dispute resolution agreement that applied to his charge of racial discrimination pending with the Equal Employment Opportunity Commission. Bagby Elevator appeals a jury verdict that awarded compensatory and punitive damages to Goldsmith based on his complaint of both racial discrimination and retaliation. See *42 U.S.C. § 1981*; *42 U.S.C. §§ 2000e-2000e-17*. In *Weeks v. Harden Manufacturing [*1268] Corp., 291 F.3d 1307 (11th Cir. 2002)*, we ruled that a refusal to sign an arbitration agreement was not a protected activity that could support a claim of retaliation, but we did not address an employee's refusal to sign an agreement that applied to a pending charge of discrimination. Goldsmith was willing to execute an amended dispute resolution agreement that would not have applied to his pending charge, but Bagby Elevator insisted that Goldsmith sign an agreement that applied to the pending charge and fired him immediately after he refused to do so. We conclude that Bagby Elevator was not entitled to a judgment as a matter of law against Goldsmith's claim of retaliation [**3] because there was sufficient evidence of a causal relation between the filing of his pending charge and later termination. As a result,

* Honorable Clay D. Land, United States District Judge for the Middle District of Georgia, sitting by designation.

Page 2 of 20


we need not decide any issue about the verdict regarding Goldsmith's alternative claim that he was terminated based on his race.

Bagby Elevator also challenges several other rulings of the district court, including rulings regarding the admissibility of evidence, and the awards of punitive damages, attorney's fees, and costs to Goldsmith, all of which we affirm. The district court did not abuse its discretion in four of its evidentiary rulings: (1) evidence that Bagby Elevator discriminated and retaliated against Goldsmith's coworkers was relevant to prove the intent of Bagby Elevator to discriminate and retaliate and supported Goldsmith's claim of a hostile work environment; (2) evidence that Arthur Bagby III, the owner and president of Bagby Elevator, uttered the racial slur "nigger" in the presence of the employee who fired Goldsmith, but outside the workplace, suggested both that the employee who heard these comments had reason to believe that racial discrimination was tolerated at Bagby Elevator and that the antidiscrimination policy of Bagby Elevator [**4] was ineffective; (3) the testimony of a courtroom deputy that Arthur Bagby said to an employee-witness, "Go get 'em champ," immediately before the witness testified was not unduly prejudicial; and (4) the determination of the EEOC that there was reason to believe that Goldsmith's charge of discrimination was true was admissible based on our well-established precedents. We affirm the award of punitive damages, because there was sufficient evidence at trial that Bagby Elevator was recklessly indifferent to Goldsmith's federal rights and the ratio of that award to the award of compensatory damages, which is 9.2 to 1, is not so excessive as to violate due process. We also affirm the award of attorney's fees to Goldsmith who won substantial relief for his related claims against Bagby Elevator.

## I. BACKGROUND

Before we address the merits of this appeal, we review two matters. First, we review the trial record regarding the relevant facts. Second, we review the procedural history of this litigation.

### *A. Facts*

In March or April 1998, Bagby Elevator hired Goldsmith, a black man, to work in its shop in Birmingham, Alabama, as an elevator fabricator. Ron Farley, the shop foreman, offered Goldsmith [**5] the job and became Goldsmith's supervisor. In his employment with Bagby Elevator, Goldsmith delivered parts to job sites throughout the southeastern United States and assisted with the installation of those parts. As a fabricator, Goldsmith was also required to build elevator parts. Goldsmith also performed special projects for Arthur Bagby, which included building a wicket driver and installing lighting and light diffusers at Arthur Bagby's house.

Goldsmith performed his job well. He was assigned the majority of the duties of manufacturing specialty parts and items [*1269] for elevators. Goldsmith received several raises in pay based on Farley's recommendations, and Bagby Elevator later designated Goldsmith as a lead man in the shop. Goldsmith enjoyed his work but testified that his employment was tainted by a racially hostile atmosphere.

Farley uttered racial slurs at work, but Goldsmith's complaint about Farley's slurs was rebuffed. In February 2001, Curlie Thomas, a black employee of Bagby Elevator, told Goldsmith that Farley had said to Thomas, "If I give a nigger ice cream, would he eat it?" Goldsmith reported Farley's racial slur to Vice President Arthur Steber, who told Goldsmith, "I've [**6] already heard." Goldsmith expressed concern about working with Farley and asked Steber if there was any reason that he needed to be worried about his job after learning of Farley's racial slurs. Steber replied, "Well Goldie, you know, that's just the way Ron [Farley] is. You are just going to have to accept it." Farley continued to supervise Goldsmith.

Farley's racial slurs at work continued to offend Goldsmith. Sometime after his complaint to Steber, Goldsmith went to Farley's office and overheard Farley say in a telephone conversation with a white employee, "Howard, them niggers are crazy. Them some of the dumbest niggers I ever seen in my life." Goldsmith opened Farley's office door after Farley uttered the racial slur, handed Farley a folder, shook his head, and walked out of Farley's office. Goldsmith testified that he did not report this comment because Steber had already told Goldsmith that he would have to accept Farley's behavior.

Farley's nephew, David Walker, also contributed to the racially hostile atmosphere that Goldsmith experienced while employed at Bagby Elevator. Goldsmith worked in the shop with Walker, who is white, and heard Walker utter racial slurs. Goldsmith heard [**7] Walker call Anthony Jemison, a black man who worked with them, a

Page 3 of 20


"monkey" on several occasions. Goldsmith also heard Walker tell Jemison, "Monkey, get back in your cage." Larry Isbell, a white employee who worked in the shop, also heard Walker's "monkey" comments. Walker told Goldsmith that Walker and Farley were "going to fuck them a black lady before they die." On one occasion, Goldsmith, Walker, Isbell, and Jemison sat together during a break and Walker said, "You know, I really never liked black folks no how."

In addition to uttering racial slurs, Walker threatened Goldsmith with violence. Specifically, Walker told Goldsmith that Walker was going to make Goldsmith's son an orphan. Isbell overheard this comment by Walker and reported it to Farley because Isbell feared that Walker was going to kill Goldsmith. Isbell told Farley that there was "bad blood" between Goldsmith and Walker. Farley said he would not do anything except separate Walker and Goldsmith. Farley did not separate Walker and Goldsmith, and they continued to work together after this incident.

Goldsmith also believed that his efforts to obtain a promotion were hampered by racial barriers at Bagby. When Goldsmith applied [**8] to Larry Gardner at the union for a higher-paying field position, Gardner reported to Goldsmith that Johnny Bowden, the purchasing manager at Bagby Elevator, had said they would not interview Goldsmith for the position because "they don't mix the front and the back." Goldsmith testified that the majority of workers in the shop were black and that Bagby Elevator never had a black employee in the field.

Bagby Elevator had an antidiscrimination policy that was printed in the employee handbook issued to all employees. There were three versions of the employee [*1270] handbook, one issued in 1995 and two revised versions issued in 1998 and 2000, and all three contained the policy against the use of racial slurs. The 2000 version of the handbook explained the antidiscrimination policy in a section entitled "Equal Employment Opportunities":

> The company does not discriminate on the basis of a person's race, religion, color, age, sex, national origin, handicap or disability regarding any term or condition of employment including but not limited to hiring, training, on-the-job treatment, promotion, discipline, and termination. It is the responsibility of all employees to practice fair treatment toward [**9] everyone at all times. Any violation of these equal opportunity policies by any employee must be reported immediately to management.

The policy against and process for reporting harassment, including racial slurs, was explained as follows in a section of the handbook entitled "No Harassment Policy":

> The company's position is that harassment is a form of misconduct, which undermines the integrity of the employment relationship. No employee should be subject to unsolicited and unwelcome conduct, either verbal or physical.
>
> Bagby Elevator Company, Inc. does not and will not tolerate harassment of our employees. The term "harassment" includes, but is not limited to slurs, jokes, pranks, signs, and other verbal, graphic, or physical conduct relating to an individuals [sic] race, color, sex, religion, national origin, citizenship, age, handicap or disability.
>
> . . . .
>
> Harassment, whether committed by supervisory or non-supervisory personnel, is specifically prohibited as unlawful and against stated company policy. In addition, the company's management is responsible for taking action against acts of harassment and investigating all complaints of harassment.
>
> . . . .
>
> If you believe that you have been [**10] harassed in any way by an employee, supervisor or manager, customer or vendor, you should report such conduct to your immediate supervisor or the company's ranking personnel representative, April/Office Manager. It is the responsibility of the facility's ranking personnel representative to provide guidance, investigate the charges of impropriety, and recommend appropriate action. All claims must be thoroughly investigated. General Manager will provide guidance and assistance [with] [sic] the proper handling or any and all allegations. The matter will be promptly and thoroughly investigated and where appropriate, disciplinary action will be taken. If an employee registers a complaint of harassment with the Office Manager, his/her supervisor or a management official, he/she will not be penalized in any way for reporting such conduct.

Although Bagby Elevator maintained an antidiscrimination policy, its effectiveness was dubious. Bowden testified that there had been a policy against

the utterance of racial slurs in the workplace during the eleven years that he had worked at Bagby Elevator, but Bowden admitted that the policy did not prevent Farley, who received a copy of each handbook, [**11] from uttering racial slurs in the workplace. Arthur Bagby testified that he was not "that good on the [antidiscrimination] policy," and he admitted that he did not know how he would discipline a supervisor for using racial slurs. Goldsmith testified that Bagby Elevator did not provide training regarding discrimination in the workplace.

Goldsmith offered additional evidence that the antidiscrimination policy of Bagby Elevator was ineffective. Bowden testified [*1271] that, if Farley had uttered another racial slur at work after the September 2000 reprimand, Farley would have been fired. There was evidence that Farley was reprimanded again in February 2001, but he was not fired. Goldsmith argued during closing arguments that Bagby Elevator never intended to fire Farley because it did not enforce its antidiscrimination policy and "wanted to keep them [black employees] down."

On October 5, 2001, Goldsmith filed his first EEOC charge. The charge alleged that Bagby Elevator discriminated against him on the basis of race, subjected him to a racially hostile work environment, and failed to promote him to a field position on the basis of race. Goldsmith named Farley as the harasser, and Goldsmith stated [**12] that he had complained to Steber to no avail. In November 2001, Bagby Elevator responded to Goldsmith's EEOC charge and to other EEOC charges filed by Goldsmith's coworkers.

Before he filed his first EEOC charge, Goldsmith had never been reprimanded by Bagby Elevator but he was disciplined several months after he filed a charge of discrimination. On April 26, 2002, Bowden and Jerry Wilmas, another supervisor, reprimanded Goldsmith in writing ostensibly because he had been absent from work on April 25, 2002, and did not call Bagby Elevator in advance of his absence. Goldsmith testified that he had told Wilmas that he was going to miss work that day and had recorded his anticipated absence in a calendar that employees used to provide notice of days they intended to miss work. Walker, a white employee, also recorded a day in the calendar on which he was absent in April, and he was not reprimanded after he missed work that day.

On June 6, 2002, sixteen days after our decision in Weeks, an employee of Bagby Elevator, Alan Webster, gave Goldsmith a document entitled "Dispute Resolution Agreement," which was an agreement to arbitrate all "past, present, and future" claims against Bagby Elevator. [**13] Goldsmith was instructed that he had to sign and return the agreement by the next day. Bagby Elevator required all employees to sign the agreement and argued both at trial and on appeal that, under Weeks, the requirement that all employees sign the agreement could not support a claim of retaliation.

Goldsmith refused to sign the agreement, and initially Isbell refused to sign it too. Steber told both Isbell and Goldsmith that, if they refused to sign the agreement, they would be fired. Both men packed their belongings and left to enter their vehicles.

In the end, Isbell signed the agreement after being urged to reconsider, but Goldsmith was treated differently. After Isbell packed his belongings, Bowden stopped Isbell from leaving the shop and told Isbell that he should not resign because of the agreement. Bowden urged Isbell to talk to someone about the agreement. Isbell later signed the agreement after he consulted a union representative, and Bagby Elevator did not fire him when he returned the signed agreement the next day. Bowden did not ask Goldsmith to reconsider. Goldsmith contended during trial that Bowden's failure to ask Goldsmith to reconsider suggested that supervisors at [**14] Bagby Elevator wanted to convince white employees, but not black employees, to remain at Bagby Elevator.

Goldsmith proposed amending the agreement. On June 6, 2002, Goldsmith's lawyer revised the agreement to exclude its application to any of Goldsmith's pending claims by crossing out the words "past" and "present." Goldsmith returned to Bagby Elevator on June 7, 2002, and was escorted to Steber's office by Bowden, who did not talk to Goldsmith about the [*1272] agreement. Goldsmith handed Steber a letter from his attorney that requested that the words "past" and "present" be removed from the agreement before Goldsmith signed it. Goldsmith told Steber that he would sign a version of the agreement that had been amended to omit the words "past" and "present" and gave Steber the amended version. Goldsmith wanted to remove these words because he did not want the agreement to apply to his pending EEOC charge.

Steber and the general counsel for Bagby Elevator, Hunter Bagby, refused to accept Goldsmith's amended agreement. Steber told Goldsmith that Steber would consider Goldsmith to have resigned if Goldsmith did

Page 5 of 20


not sign the agreement. Steber told Goldsmith that everyone, including himself and Arthur [**15] Bagby, had to sign the agreement, that it was a new policy of Bagby Elevator, and that the lawyers of Bagby Elevator had recommended this change.

Goldsmith did not sign the agreement and refused to resign, but Steber fired him. Steber told Goldsmith to leave the premises, and Bowden escorted Goldsmith off the premises. Steber knew when he fired him that Goldsmith was the only employee with a charge of discrimination pending with the EEOC.

Goldsmith filed his second EEOC charge on June 7, 2002. The charge alleged racial discrimination, wrongful termination on the basis of race, and retaliatory termination. On September 30, 2002, the EEOC issued a cause determination with three findings: (1) Bagby Elevator had retaliated against Goldsmith for filing an EEOC charge by disciplining and firing Goldsmith in violation of Title VII; (2) Bagby Elevator had discriminated against Goldsmith with respect to a promotion because of his race in violation of Title VII; and (3) Bagby Elevator had subjected all black employees as a class to a racially hostile work environment in violation of Title VII.

After Goldsmith was terminated, he filed a claim for unemployment benefits, which was initially denied [**16] because of opposition by Bagby Elevator. Bagby Elevator withdrew its opposition after Goldsmith appealed the denial of his unemployment benefits. Hunter Bagby and Steber both acknowledged that Bagby Elevator withdrew its opposition to Goldsmith's award of benefits because they believed that Goldsmith had a right to refuse to sign the agreement. During his closing argument, Goldsmith argued that this evidence proved how far Bagby Elevator was willing to go to retaliate against employees who complained about racial discrimination.

Other black employees at Bagby Elevator testified that they also suffered racial discrimination at work. Thomas testified that he heard racially offensive comments while he worked at Bagby Elevator. When Thomas and Farley were on an errand one day, Farley told the store cashier, "Look, I bought me a slave." On another occasion, Thomas overheard Farley say to a white employee, "If you think you could teach a nigger to eat ice cream, would he?" Bowden came into the break room on another occasion when several black employees, including Thomas and Goldsmith, were eating and said, "I thought y'all ate hot sauce with y'all's chicken."

Although Bagby Elevator presented [**17] evidence that it had reprimanded employees who uttered racial slurs, Goldsmith presented evidence that suggested that these employees were never reprimanded. Thomas reported Farley's slur about ice cream to his supervisor, Wilmas, who told Thomas to report the slur to Bowden. Bowden told Thomas that the incident had already been handled and that Thomas [*1273] should not tell anyone else about it, which Goldsmith contended at trial suggested that nothing was done at all. Bowden, who was responsible for hiring and firing at Bagby Elevator in 2000, testified that he reprimanded Farley after Thomas reported Farley's racial slur on September 14, 2000. Bowden had consulted Steber before he issued Farley a written reprimand. Bowden testified that he reprimanded Farley in writing because Farley admitted that he made the racial slur. Bowden wrote "Verbal warning was issued in the presence of everyone in the department" on Farley's written reprimand, but Bowden admitted at trial that Farley was never verbally reprimanded in front of all shop employees and could not explain why he wrote that sentence. Farley did not sign the reprimand, and no one signed as a witness, as the document required. During [**18] closing argument, Goldsmith argued that this evidence proved that Farley was never reprimanded and that Bagby Elevator manufactured evidence to cover acts of discrimination.

One employee who reported racial slurs was fired before his resignation became effective. In March 2001, Thomas submitted his resignation, which became effective two weeks after submission, because he had been denied a raise, had endured hearing racial slurs in the workplace, and had obtained another job. One week later, Bowden reported that he had seen Thomas try to "run someone off the road" in a Bagby Elevator truck, and Bowden recommended that Thomas's resignation be accepted immediately. Bowden told Thomas what he had seen and terminated Thomas's employment. Thomas denied driving recklessly and testified that he was terminated six weeks after he complained about Farley's ice cream comment to Bowden.

Anthony Jemison, a black man who worked in the shop with Goldsmith, was also fired after he reported Farley's racial slurs. Jemison filed an EEOC charge on October 30, 2001, in which Jemison complained about racial slurs uttered by his supervisor, Farley. Jemison's employment was terminated on December 20, 2001, [**19] for an alleged frolicking detour in a Bagby Elevator truck. Steber was aware of Jemison's

Page 6 of 20


complaints, but Steber allowed Farley to participate in the decision to terminate Jemison's employment.

Latrinda Peoples, a black woman, testified that she also suffered racial discrimination at Bagby Elevator. Peoples began working for Bagby Elevator as a filing clerk in October 1997. She was promoted to the position of permanent payroll clerk. Peoples was later demoted to a billing clerk position and trained her replacement, a white woman who was paid more money than Peoples. During her employment at Bagby Elevator, Peoples saw payroll documents that established that Bagby Elevator paid its white employees more than its black employees for the same duties. As part of her employment, Peoples took the payroll checks to Arthur Bagby, for his signature. Peoples testified that she would speak to Arthur Bagby but he would never speak to her, even though Peoples often saw Arthur Bagby socialize with white employees. Peoples also testified that she and another black employee were told to wash dishes after company picnics or cookouts.

Peoples filed an EEOC charge on October 31, 2001, that alleged discrimination [**20] on the basis of race and gender, and she, like other black employees, was treated differently by Bagby Elevator after she filed this charge. Before Peoples filed her EEOC charge, she testified that she had never been reprimanded by Bagby Elevator, she had always received good performance evaluations, and there had been no criticisms of her work. After Peoples filed her EEOC charge, Shirl Braswell, who [*1274] was Peoples's supervisor, and Steber met with Peoples and required her to sign a promissory note and pay interest on an existing employee salary advance, which she had never been required to do for previous advances. Braswell also reprimanded Peoples in writing for removing from her paychecks the automatic deductions that were used to repay the salary that Bagby Elevator had advanced to her, but Peoples denied that she removed the deductions without authority from a supervisor. Peoples testified that, after she filed her EEOC charge, she was warned about having visitors at work but other white employees were not similarly warned. Peoples also testified that after she filed her EEOC charge she received more of the workload. Peoples was fired on May 24, 2002, for alleged insubordination.

Goldsmith [**21] called both Steber and Arthur Bagby as witnesses. Steber denied ever having heard Hunter or Arthur Bagby call Goldsmith a "nigger" or having heard anyone at work utter that term, but Steber later testified that he had heard Arthur Bagby utter the racial slur at the Birmingham Country Club. Arthur Bagby admitted that he had uttered the slur "nigger" in the past, denied uttering the slur at the country club, and testified that he had never heard Farley utter a racial slur.

Goldsmith called James Ward, field supervisor of Bagby Elevator, to testify that Ward had liked Goldsmith's work and wanted to hire him in the field. Ward testified that he was unaware of the policy of Bagby Elevator that the company did not move shop workers to the field until he spoke with management at Bagby Elevator about moving Goldsmith from the shop to the field as a probationary helper. Ward also testified that there were no black probationary helpers employed at the Birmingham location of Bagby Elevator. Ward testified that he had heard white field employees utter racial slurs but he did not reprimand them.

After Ward testified, the district court reported to the attorneys that, when Tammi McFall, the courtroom [**22] deputy, went to the witness room to escort Ward to the witness stand, she overheard Arthur Bagby, Ward's boss and current CEO and chairman of the board of Bagby Elevator, tell Ward, "Go get 'em, champ." The district court reminded counsel that it had asked McFall to report any comments that she heard outside the presence of the court and McFall had consistently done so. The district court further stated that the courtroom deputy did not have instructions to report what she "thinks is appropriate or inappropriate," but that she had instructions to report anything said to her to the court. McFall had previously reported inappropriate comments made by a black juror, and the juror was dismissed based on these comments.

After witnesses who were members of Bagby Elevator management denied hearing this comment, the court permitted Goldsmith to call McFall to impeach the testimony of managers of Bagby Elevator. Goldsmith recalled Ward to the stand to question him about the comment, and Ward admitted that he was in the witness room with Arthur Bagby but stated that he did not remember the comment. Goldsmith then called McFall to testify, over the objection of Bagby Elevator that she was a court [**23] employee and would present prejudicial testimony. McFall testified about Arthur Bagby's comment.

*B. Procedural History*

Goldsmith filed his complaint on May 2, 2003.

Page 7 of 20


Goldsmith's complaint alleged that he suffered racial discrimination in his employment and included claims of a hostile work environment, failure to obtain a promotion, [*1275] wrongful termination, and retaliation. *42 U.S.C. §§ 2000e-2000e-17*; *42 U.S.C. § 1981*. Goldsmith sought lost wages and benefits as a result of being denied a field position and being terminated. He also sought injunctive relief, compensatory damages, punitive damages, attorney's fees, expenses, and costs.

On June 8, 2006, Goldsmith filed a motion to amend the complaint to add a claim that Bagby Elevator had engaged in a pattern and practice of retaliation and race discrimination. Bagby Elevator opposed the motion. That same day the district court granted Goldsmith's motion for leave to amend.

On June 13, 2006, the trial began and lasted until June 16, 2006. At the close of Goldsmith's case, Bagby Elevator moved for judgment as a matter of law on all claims. The district court dismissed the retaliation claim regarding Goldsmith's allegation that he had been reprimanded [**24] by Bagby Elevator, dismissed the pattern and practice claim, and denied the motion as to all other claims. At the close of all evidence, Bagby Elevator renewed its motion for a judgment as a matter of law, and the court denied the motion.

The jury returned a verdict in favor of Goldsmith on his claims for wrongful termination based on race and retaliatory termination for filing an EEOC charge. The jury awarded him $ 27,160.59 in back pay, $ 27,160.59 in damages for mental anguish, and $ 500,000 in punitive damages. Goldsmith did not prevail on his failure to promote claim. The jury determined that, although Goldsmith had worked in a racially hostile environment, which had been permitted by a supervisor, Goldsmith had not been damaged as a proximate result of that environment.

On June 26, 2006, the district court entered judgment in accordance with the jury verdict. On July 7, 2006, Bagby Elevator filed a post-trial motion for a judgment as a matter of law or, alternatively, a new trial or remittitur. The district court summarily denied this motion.

On July 10, 2006, Goldsmith moved for an award of costs and attorney's fees. On August 2, 2006, the district court awarded $ 151,210 in attorney's [**25] fees and $ 9,328.17 in costs to Goldsmith. Bagby Elevator moved for reconsideration of this order, and the district court reduced the award of costs to $ 8,755.74.

**III. STANDARDS OF REVIEW**

We review the denial of a motion for a judgment as a matter of law de novo, and apply the same standards as the district court. *Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997)*. We "will reverse only if 'the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict.'" *Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 n.12 (11th Cir. 2005)* (quoting *Combs, 106 F.3d at 1526*). We "consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)* (citing *Miles v. Tenn. River Pulp & Paper Co., 862 F.2d 1525, 1527-28 (11th Cir. 1989))*.

Several standards of review govern our review of the amount of punitive damages. "We review de novo the denial of . . . [a] motion for judgment as a matter of law on the issue of punitive damages." *Lambert v. Fulton County, Ga., 253 F.3d 588, 597 (11th Cir. 2001)* (citing *EEOC v. W & O, Inc., 213 F.3d 600, 610 (11th Cir. 2000))*. [**26] We review for an abuse of discretion the decisions of the district court to regulate closing arguments of counsel. See *Commercial Credit Equip. Corp v. L & A Contracting Co., 549 F.2d 979, 981 (5th Cir. 1977)*. We review de novo whether [*1276] the award of punitive damages violated due process. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 443, 121 S. Ct. 1678, 1689, 149 L. Ed. 2d 674 (2001)*; see *BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996)*. We defer to the factual findings of the district court unless they are clearly erroneous. *Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1334 (11th Cir. 1999)*.

We review deferentially rulings about admitting evidence. We review a ruling on the admissibility of evidence for an abuse of discretion. *Goulah v. Ford Motor Co., 118 F.3d 1478, 1483 (11th Cir. 1997)* (citing *Joiner v. Gen. Elec. Co., 78 F.3d 524, 529 (11th Cir.1996))*. We will not overturn an evidentiary ruling unless the moving party establishes a substantial prejudicial effect. *Judd v. Rodman, 105 F.3d 1339, 1341 (11th Cir. 1997)* (citing *King v. Gulf Oil Co., 581 F.2d 1184, 1186 (5th Cir. 1978))*.

We review a grant of leave to amend the pleadings for abuse of discretion. [**27] *Walker v. S. Co. Servs., Inc., 279 F.3d 1289, 1291 (11th Cir. 2002)*. We will not reverse if an error of the district court is harmless, and

Page 8 of 20


the standard for harmless error is whether the complaining party's substantive rights were affected. SEC v. Diversified Corp. Consulting Group, 378 F.3d 1219, 1228 (11th Cir. 2004).

We also give deference to decisions about jury instructions. We review jury instructions de novo to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party, United States v. Chandler, 996 F.2d 1073, 1085 (11th Cir. 1993), but the district court is given wide discretion as to the style and wording employed in the instructions, Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1543 (11th Cir. 1996). Reversal is warranted for the failure to give a proposed instruction only if this failure prejudiced the requesting party. Roberts & Schaefer Co. v. Hardaway Co., 152 F.3d 1283, 1295 (11th Cir. 1998).

We review the award of attorney's fees and costs for an abuse of discretion, and we review questions of law de novo and subsidiary findings of fact for clear error. Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 442 F.3d 1283, 1287 (11th Cir. 2006) [**28] (citing Dillard v. City of Greensboro, 213 F.3d 1347, 1353 (11th Cir.2000)).

**IV. DISCUSSION**

Bagby Elevator raises a host of arguments about the judgment entered against it after the jury trial. Some issues involve the ultimate outcome of the trial, such as whether Bagby Elevator was entitled to a judgment as a matter of law or Goldsmith was entitled to an award of punitive damages. Some issues involve the conduct of the trial, such as the admission of evidence and jury instructions. One issue involves a pretrial ruling about an amendment of the complaint to assert a claim that was later dismissed. A final issue involves the post-trial award of attorney's fees and costs.

In all, Bagby Elevator raises eleven separate issues on appeal. We first discuss the three issues about the ultimate outcome: (1) whether Bagby Elevator was entitled to a judgment as a matter of law regarding Goldsmith's claim of retaliation; (2) whether we need to address any issue regarding the verdict of the jury that Goldsmith was terminated on the basis of race; and (3) whether the district court erred when it refused to reverse or remit the $ 500,000 award of punitive damages. We then turn to the six issues about [**29] the conduct of the trial: (1) whether the district court abused its discretion when it admitted evidence of discrimination and retaliation against Goldsmith's coworkers [*1277] by Bagby Elevator; (2) whether the district court erred when it failed to give the jury an instruction proposed by Bagby Elevator that would have prohibited consideration of evidence of discrimination and retaliation against Goldsmith's coworkers; (3) whether the district court abused its discretion when it admitted as evidence the cause determination by the EEOC regarding Goldsmith's charge; (4) whether the district court erred when it instructed the jury about damages for mental anguish; (5) whether the district court abused its discretion when it allowed Goldsmith to elicit testimony from Steber, Hunter Bagby, and Arthur Bagby about their utterance of the racial slur "nigger"; and (6) whether the district court abused its discretion when it allowed Goldsmith to call the courtroom deputy to testify at trial. We then discuss the issue about a pretrial ruling: whether the district court abused its discretion when it allowed Goldsmith to amend his complaint. Finally, we discuss whether the district court abused its discretion [**30] when it awarded costs and attorney's fees to Goldsmith.

*A. The District Court Did Not Err When It Denied the Motion for a Judgment as a Matter of Law Regarding Goldsmith's Claim of Retaliation.*

Bagby Elevator argues that the district court erred when it denied the motion for a judgment as a matter of law regarding Goldsmith's claim of retaliation. Bagby contends that Goldsmith did not establish a causal relation between the filing of his EEOC charge and his termination and did not prove that the reason offered by Bagby Elevator for Goldsmith's termination was pretextual. Bagby Elevator also argues that it was entitled to a judgment as a matter of law in its favor because it proved that it would have made the decision to terminate Goldsmith even absent any retaliatory motive.

To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered an adverse employment action, and there was some causal relation between the two events. Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004) (citing Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997)). After [**31] the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability. Coutu v. Martin County

Page 9 of 20


Bd. of County Comm'rs, 47 F.3d 1068, 1073, 1075 n.54 (11th Cir. 1995). The plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct. Id.

We reject the arguments of Bagby Elevator. There was sufficient evidence of a causal relation between the filing of Goldsmith's EEOC charge and his termination. The jury was entitled to find that Bagby Elevator did not have a legitimate nonretaliatory reason for Goldsmith's termination. Bagby Elevator also was not entitled to prevail on its same decision defense as a matter of law.

1. There Was Sufficient Evidence of a Causal Relation Between Goldsmith's EEOC Charge and His Termination.

We have explained that the causal element for a claim of retaliation can be proved by circumstantial evidence:

> We do not construe the 'causal link' in the [retaliatory discharge] formula to be the sort of logical [**32] connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of [*1278] discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the "causal link" element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated.

Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985). We construe the causal link element broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (quoting EEOC v. Reichhold Chems., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993)) (internal quotation marks omitted).

Bagby Elevator argues that, because Goldsmith filed the EEOC charge in October 2001 and was not terminated until June 2002, the "temporal gap" of eight months between the two events was too remote to establish a causal relation, but this argument is a straw man. Goldsmith does not contend that the timing of these two events alone established circumstantial [**33] evidence of a causal relation. Goldsmith contends that the submission of the dispute resolution agreement is also relevant to the causal relation.

Goldsmith argues that his immediate termination for his refusal to sign the agreement established a causal relation between his protected activity--the filing of his charge of discrimination--and his termination. We agree. Goldsmith was terminated immediately after and because he refused to sign an agreement that would have applied to his pending charge. Goldsmith was willing to agree to arbitrate any future charges, but Bagby Elevator insisted that he sign an agreement that covered his pending charge. Bagby Elevator does not dispute that Steber was aware of Goldsmith's EEOC charge when Steber terminated Goldsmith and that Goldsmith was the only employee who had a charge of discrimination pending when Bagby Elevator required all of its employees to sign the agreement. "In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) [**34] (citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993); Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997)).

Bagby Elevator insists that our decision in Weeks compels a different conclusion, but we disagree. In Weeks, we concluded that a compulsory arbitration agreement is not an unlawful employment practice under the federal laws regarding employment discrimination. 291 F.3d at 1315-16. We concluded that the termination of plaintiffs who did not already have pending or even threatened EEOC charges for their failure to sign an arbitration agreement was not retaliation under Title VII because the plaintiffs could not have had an objectively reasonable belief that their refusal was a statutorily protected activity. Id. at 1316-17. Unlike the plaintiffs in Weeks, it is undisputed that Goldsmith had a pending EEOC charge when he was required to sign an agreement that applied to that charge.

Goldsmith's complaint is substantially different from the complaint in Weeks. Goldsmith was terminated immediately after and because he refused to relinquish his right to a jury trial for his pending charge. Goldsmith offered to sign an amended agreement that would [**35] exempt his pending charge from arbitration, but Bagby Elevator refused to accept the amendment. When it fired Goldsmith, Bagby Elevator was aware of Goldsmith's charge of discrimination. No other employee had [*1279] a pending charge when Goldsmith was terminated, although other employees with pending charges had been terminated earlier.

When another employee objected to the dispute resolution agreement, the employee was urged to reconsider, but Goldsmith was not. Taken together, this evidence was sufficient for a reasonable jury to find a causal relation between the filing of Goldsmith's charge of discrimination and his termination.

2. Bagby Elevator Did Not Offer a Nonretaliatory Reason for Goldsmith's Termination.

Bagby Elevator contends that it was entitled to a judgment as a matter of law based on its legitimate nonretaliatory reason for Goldsmith's termination, but again this argument misses the mark. Bagby Elevator failed to prove a nonretaliatory reason for Goldsmith's termination. Bagby Elevator stated that its reason for Goldsmith's discharge was his refusal to sign the agreement, but that reason is retaliatory. The agreement would have affected Goldsmith's continued pursuit of his [**36] pending charge of discrimination.

3. Bagby Elevator Is Not Entitled To Prevail on the Same Decision Defense.

Finally, Bagby Elevator argues that, even if it retaliated against Goldsmith, the evidence established that it would have terminated Goldsmith regardless whether any unlawful factor played a role in its decision. We disagree. The problem for Bagby Elevator is the same one that infects all of its arguments about Goldsmith's claim of retaliation.

What Bagby Elevator contends was evidence of a legitimate nonretaliatory reason was, in fact, the opposite. In Steger v. General Electric Co., we explained that the same decision defense requires evidence of a legitimate nondiscriminatory reason:

> When the employee has shown that the employment decision was based on an illegal motive, the employer may avoid liability by proving by the preponderance of the evidence that the decision would have been made the same in the absence of discrimination. The employer's evidence "must show that its legitimate reason, standing alone, would have induced it to make the same decision."

318 F.3d 1066, 1075 (11th Cir. 2003) (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 252, 109 S. Ct. 1775, 1792, 104 L. Ed. 2d 268 (1989)) [**37] (citations omitted). The jury was entitled to find, for the reasons that we have already explained, that Bagby Elevator did not have a legitimate reason for requiring Goldsmith to sign an agreement that applied to his pending charge of discrimination.

*B. We Need Not Review Any Issue About the Verdict That Goldsmith Was Terminated Based on Race.*

Bagby Elevator argues that it was entitled to a judgment as a matter of law against Goldsmith's claim of termination on the basis of race and that the district court abused its discretion when it failed to instruct the jury that it must find that intentional discrimination on the basis of race was the true reason for Goldsmith's termination, but we need not resolve these issues. The jury found that Goldsmith's termination was both based on race and retaliatory. The jury awarded compensatory damages once for the wrongful termination, in accordance with the instructions by the district court and the jury verdict form. Because we conclude that the jury was entitled to return a verdict for Goldsmith on his claim of retaliation and the jury awarded the same damages based upon both theories of wrongful termination, we need not address any issues about [**38] Goldsmith's alternative claim that his termination was based on his race. [*1280] See Edwards v. Bd. of Regents of Univ. of Ga., 2 F.3d 382 (11th Cir. 1993) (where sufficient evidence supported a general verdict on retaliation claim, court did not need to review claim of age discrimination).

*C. Substantial Evidence Supported the Punitive Damages Award, Bagby Elevator Was Not Unduly Prejudiced When Goldsmith Failed to Argue Punitive Damages in His First Closing Argument, and the Award Was Not Excessive.*

Bagby Elevator argues that we should reverse or remit the $ 500,000 in punitive damages awarded by the jury on three grounds. First, Bagby argues that there is no evidence that it acted with malice or reckless indifference to Goldsmith's federally protected rights. Bagby Elevator contends that it acted in good faith to comply with the civil rights laws because it had an effective policy against discrimination. Second, Bagby Elevator argues that Goldsmith did not argue the issue of punitive damages in his first closing argument and that he should not have been allowed to raise the issue of punitive damages in his final closing argument. Third, Bagby Elevator argues that the punitive damages award [**39] is excessive in violation of due process.

We reject each of these arguments. There was sufficient evidence that Bagby Elevator was recklessly indifferent

to Goldsmith's federally protected rights, and the jury was entitled to find that the policy of Bagby Elevator against workplace discrimination was ineffective. The district court did not err when it allowed Goldsmith to argue punitive damages in his final closing argument because Bagby Elevator was on notice that punitive damages were an issue in the trial and counsel for Bagby Elevator did not request an opportunity to reply to this argument. The punitive damages award also was not excessive.

1. There Was Sufficient Evidence of Malice or Reckless Indifference to Goldsmith's Federally Protected Rights.

"The Supreme Court has directed that, for the issue of punitive damages to reach the jury in a *section 1981* case, the plaintiff must come forward with substantial evidence that the employer acted with actual malice or reckless indifference to his federally protected rights." *Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002)* (citing *Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536-37, 119 S. Ct. 2118, 2125-26, 144 L. Ed. 2d 494 (1999)*). [**40] "Malice means an 'intent to harm' and recklessness means 'serious disregard for the consequences of [one's] actions.'" *Ferrill v. Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999)* (quoting *Splunge v. Shoney's, Inc., 97 F.3d 488, 491 (11th Cir. 1996)*) (alteration in original). "Malice or reckless indifference is established by a showing that the employer discriminated in the face of the knowledge that its actions would violate federal law." *Miller, 277 F.3d at 1280* (citing *Kolstad, 527 U.S. at 536, 119 S. Ct. at 2125*). To be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Kolstad, 527 U.S. at 536, 119 S. Ct. at 2125*. We have cited as examples of conduct that could support a punitive damages award: "(1) a pattern of discrimination, (2) spite or malevolence, or (3) a blatant disregard for civil obligations." *Dudley v. Wal-Mart Stores, Inc., 166 F.3d 1317, 1322-23 (11th Cir. 1999)*.

Goldsmith presented sufficient evidence from which the jury could reasonably infer that Bagby Elevator was recklessly indifferent to Goldsmith's federal [*1281] rights under *section 1981* and Title VII. The record establishes [**41] that, although Steber knew about Goldsmith's pending charge of discrimination and was involved in the investigation of it, Steber insisted that Goldsmith sign an arbitration agreement that applied to Goldsmith's pending charge. Steber also told the EEOC that Bagby Elevator did not contest Goldsmith's claim for unemployment benefits because "they now believe that [Goldsmith] had a right not to sign the [agreement]." Hunter Bagby investigated EEOC charges for the company and testified that he knew that Goldsmith had filed a serious charge, there was a likelihood of litigation arising from that charge, and "we [Bagby Elevator] don't like to come to court." Hunter Bagby also refused to accept Goldsmith's proposal to modify the arbitration agreement so that it would not apply to his pending charge of discrimination.

Evidence related to Goldsmith's other claims also supports an inference of recklessness. Steber's response to Goldsmith's complaint about Farley, "[T]hat's just the way Ron [Farley] is. You are just going to have to accept it," proved that Steber was at best apathetic to Goldsmith's civil rights despite Steber's knowledge that it was illegal to permit racial harassment in the [**42] workplace. *Alexander v. Fulton County, Ga., 207 F.3d 1303, 1338 (11th Cir. 2000)*. Isbell's report to Farley of Walker's threats directed at Goldsmith, which led to no corrective action, and Farley's failure to separate employees after complaints of discrimination and violence established that complaints were not addressed and the antidiscrimination policy was ineffective. See *Splunge, 97 F.3d at 491*(reversing award of punitive damages where employer had a policy against discrimination and investigated the complaints that it received under the policy); see also *Miller, 277 F.3d at 1279-80*. Other evidence suggested employees were not reprimanded for their utterance of racial slurs. Bowden told Thomas, after Thomas's complaint about Farley's ice cream slur, that the slur had already been handled and not to tell anyone else about the incident. See *Miller, 277 F.3d at 1279-80*. Steber's inclusion of Farley in the decision to terminate Jemison further suggested a reckless indifference to employees' federal rights. Cf. *Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1247 (11th Cir. 1998)*; *Action Marine, Inc. v. Cont'l Carbon Inc., 481 F.3d 1302, 1319 (11th Cir. 2007)*. The evidence about [**43] Peoples, Thomas, and Jemison suggested that any black employee of Bagby Elevator who complained about racial discrimination was terminated and that reckless indifference to the civil rights of black employees was a pattern at Bagby Elevator. See *Action Marine, 481 F.3d at 1319*. A reasonable jury could have found that Bagby Elevator was recklessly indifferent to Goldsmith's federal rights.

Bagby Elevator contends that it attempted in good faith to comply with the civil rights laws because it adhered to an antidiscrimination policy, but the record supports the finding of the jury that the antidiscrimination policy of

Bagby Elevator was ineffective. Goldsmith introduced evidence that managers at Bagby Elevator, namely, Steber and Bowden, had actual notice that white employees had uttered racial slurs in the workplace but did not discipline those employees. Goldsmith offered proof that other employees who had filed EEOC charges and complained of racial slurs were soon afterward terminated. Goldsmith testified that the policy was ineffective and that it did not stop Farley from making racial comments because supervisors did not follow the policy. Arthur Bagby, president and owner of Bagby [**44] Elevator, testified that he was not "that good on the [antidiscrimination] policy," and he admitted that he did not know how he would discipline a supervisor for [*1282] using racial slurs or failing to discipline an employee for using racial slurs. Both Bowden and Steber acknowledged that the policy did not prevent Farley from making a racial slur, and Steber testified that Farley could have been, but was not, terminated for making one racial slur. Goldsmith testified that Bagby Elevator did not provide training regarding discrimination in the workplace.

The district court instructed the jury that it could award punitive damages only if the jury found both that a higher management official acted with reckless indifference to Goldsmith's rights and that Bagby Elevator had not made a good faith attempt to comply with the law by adopting an anti-discrimination policy. In special interrogatories submitted to it, the jury found that Bagby Elevator had not attempted good faith compliance with the civil rights laws. The "facts and inferences [do not] point overwhelmingly in favor of [Bagby Elevator], such that reasonable people could not arrive at a contrary verdict" regarding the good faith defense [**45] asserted by Bagby Elevator. *Combs, 106 F.3d at 1526* (quoting *Carter, 870 F.2d at 581*).

2. Bagby Elevator Was Not Prejudiced When Goldsmith Argued Punitive Damages to the Jury for the First Time in His Final Closing Argument.

Bagby Elevator argues that it was deprived of due process because Goldsmith did not argue punitive damages in his first closing argument but raised the issue in rebuttal. Counsel for Goldsmith argued in rebuttal that Bagby Elevator needed to be punished and that "six figures is not going to do it." The argument of Bagby Elevator about this reference to punitive damages is meritless.

A district court has wide discretion to regulate the scope of argument. *Commercial Credit Equip. Corp., 549 F.2d at 981*. For reversible error to be found in a closing argument, the challenged argument must be "plainly unwarranted and clearly injurious." *Peterson v. Willie, 81 F.3d 1033, 1036 (11th Cir. 1996)*. No reversible error occurred here.

As counsel for Bagby Elevator conceded during oral argument, Bagby Elevator was on notice that the district court would submit the issue of punitive damages to the jury based on the complaint, the pretrial order, and jury charge conference. If Bagby [**46] Elevator had been surprised by Goldsmith's argument about punitive damages, Bagby Elevator could have requested a surrebuttal, but Bagby Elevator failed to request an opportunity to respond on this issue. Goldsmith's reference to punitive damages in his rebuttal and the jury instructions on punitive damages did not clearly prejudice Bagby Elevator.

3. The Punitive Damages Award Is Not Excessive in Violation of Due Process.

Bagby Elevator argues that the district court erred when it did not order remittitur of the award of $ 500,000 in punitive damages because the award is excessive in violation of due process. The Supreme Court has held that due process forbids the imposition of grossly excessive or arbitrary awards of punitive damages. *Gore, 517 U.S. at 562, 116 S. Ct. at 1592*. In Gore, the Supreme Court instructed courts reviewing punitive damage awards to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the ratio between the actual or potential harm suffered by the plaintiff (compensatory damages) and the punitive damage award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized [**47] or imposed in comparable cases. *Id. at 575, 116 S. Ct. at 1598-99*. In [*1283] State Farm Mutual Automobile Insurance Co. v. Campbell, the Court required exacting appellate review of the Gore guideposts to awards of punitive damages. *538 U.S. 408, 418, 123 S. Ct. 1513, 1520-21, 155 L. Ed. 2d 585 (2003)*. This close scrutiny ensures that a punitive damages award is based on an "application of law, rather than a decisionmaker's caprice." *Cooper, 532 U.S. at 436, 121 S. Ct. at 1685 (2001)* (quoting *Gore, 517 U.S. at 587, 116 S. Ct. at 1605* (Breyer, J., concurring)) (internal quotation marks omitted).

The dominant consideration in the evaluation of a punitive damage award is the reprehensibility of the defendant's conduct. *Gore, 517 U.S. at 575, 116 S. Ct.*

at 1599. To determine the reprehensibility of a defendant's conduct, a court must consider several issues: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the [**48] result of intentional malice, trickery, or deceit, or mere accident. W & O, 213 F.3d at 614-15. Evidence tending to prove a company policy or practice of discrimination can support a sizeable punitive damage award. Id. at 615 (citing Emmel v. Coca-Cola Bottling Co. of Chi., 95 F.3d 627, 637-38 (7th Cir.1996)). We conclude that the conduct of Bagby Elevator was sufficiently reprehensible to support an award of punitive damages because the harm suffered by Goldsmith was not purely economic, Goldsmith was financially vulnerable, and the racially offensive comments and conduct were not isolated.

One factor that suggests that the misconduct of Bagby Elevator was reprehensible is that Goldsmith suffered both economic harm and emotional and psychological harm. Goldsmith's relationships with his family suffered, he attended counseling after his termination, and his termination made him feel "hurt" and "upset." See id. at 614 (noting that "while the employees received economic remedies, the harm was not necessarily purely economic," but rather, "the harm included the violation of the employees' civil rights and, as the three employees testified, the infliction of worry and emotional upset"). The [**49] record also establishes that Goldsmith was financially vulnerable and had to borrow money after he was terminated.

Another factor that suggests that the misconduct of Bagby Elevator was reprehensible is that Bagby Elevator engaged in a pattern of retaliatory and discriminatory misconduct. Three other employees who had filed EEOC charges or complained about racial slurs were terminated before Goldsmith. There also was substantial evidence, as discussed above, that Bagby Elevator engaged in a pattern of reckless indifference to its employees' federal rights.

Bagby Elevator argues that the ratio of punitive damages to compensatory damages--9.2 to 1 (or $ 500,000 to $ 54,321)--is constitutionally impermissible, but we disagree. In State Farm, the Supreme Court approved of punitive damage awards that are single-digit multipliers of the corresponding compensatory damage awards: "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with [higher] ratios [of punitive to compensatory damages] . . . ." 538 U.S. at 425, 123 S. Ct. at 1524. Although the award for Goldsmith is at the high end of the [**50] range that is ordinarily constitutionally permissible, the award is not excessive.

[*1284] We have upheld punitive damage awards that were greater than single-digit multipliers of compensatory damages when the awards of compensatory damages were, like Goldsmith's damages, relatively small and there was a substantial need for deterrence. In Kemp v. American Telephone & Telegraph Co., we reduced an award of $ 1,000,000 in punitive damages to $ 250,000, which represented a 2,173 to 1 ratio of punitive damages to compensatory damages, because Georgia had a compelling interest in deterring fraudulent and illegal gambling schemes to protect financially vulnerable individuals and a single-digit multiplier of punitive damages would not have effectively deterred AT&T from future misconduct. *393 F.3d 1354, 1363-65 (11th Cir. 2004)*. In W&O, we upheld a 26 to 1 ratio of punitive damages to compensatory damages as to one plaintiff and a ratio of 16 to 1 as to another plaintiff in a pregnancy discrimination case because the award "was reasonable in terms of the interest in deterring illegal discrimination." 213 F.3d at 616-17. In Johansen, we upheld a 100 to 1 ratio of punitive damages to compensatory damages [**51] because an award limited to a single-digit multiplier of the $ 10,000 administrative fine would not have effectively deterred the corporate defendant from polluting streams in Georgia. 170 F.3d at 1339. Like the far higher ratios in these other appeals, the single-digit ratio in this appeal was not excessive in the light of the value of deterring the misconduct of Bagby Elevator.

We have also upheld awards of punitive damages that substantially exceeded compensatory damages when the defendant's misconduct, like the misconduct of Bagby Elevator, was exceedingly reprehensible. In Bogle v. McClure, we upheld compensatory damage awards of $ 500,000 and punitive damage awards of $ 1,900,000 that were awarded to each of seven plaintiffs and imposed on the board of trustees for a public library system and its director because the defendants' racial discrimination was "reprehensible" and accompanied by efforts to cover up their wrongful intent. 332 F.3d 1347, 1362 (11th Cir. 2003). Recently, in Action Marine, Inc. v. Continental Carbon Inc., we upheld a punitive damage

award of $ 17,500,000 despite the sizeable award of $ 3,200,000 in compensatory damages because the defendant's conduct was [**52] "exceedingly reprehensible." *481 F.3d at 1320*. We reasoned that the actions of the defendant likely harmed a great number of people and businesses, the defendant was undeterred by the prospect of litigation, the harm to the plaintiffs and the state was not purely economic, and the defendant exhibited a pattern of misconduct. *Id. at 1318-20*. The flagrant disregard of Goldsmith's federal rights was exceedingly reprehensible, and there was evidence of a pattern of retaliatory and discriminatory misconduct by Bagby Elevator.

The award against Bagby Elevator also does not deviate excessively from an analogous award of punitive damages under Title VII. Because Bagby Elevator employs 150 people, its damages cap under Title VII would be $ 100,000, *42 U.S.C. § 1981a(b)(3)(B)*, and an award of five times that amount is not excessive. "[A]lthough the punitive damages awarded here are more than the damages available under Title VII for analogous conduct, the difference is not enough, by itself, to suggest that the punitive damages award violates due process." *Bogle, 332 F.3d at 1362*; see also *Williams v. ConAgra Poultry Co., 378 F.3d 790, 798 (8th Cir. 2004)* (comparing the appropriate Title VII [**53] damages cap with the *section 1981* punitive damages award to determine reasonableness); *Swinton v. Potomac Corp., 270 F.3d 794, 820 (9th Cir. 2001)* (observing that, in contrast to Title VII, "Congress has not seen fit to impose any recovery caps in [*1285] cases under *§ 1981* (or *§ 1983*), although it has had ample opportunity to do so since the 1991 amendments to Title VII"). We upheld in Bogle, for example, awards of millions of dollars in punitive damages when the analogous cap under Title VII was $ 300,000. *332 F.3d at 1362*. In sum, the award of $ 500,000 in punitive damages to Goldsmith did not violate the due process rights of Bagby Elevator.

*D. The District Court Did Not Abuse Its Discretion When It Admitted Evidence of Discrimination Against Goldsmith's Coworkers.*

Bagby Elevator argues that the district court abused its discretion when it admitted evidence of discrimination and retaliation against Goldsmith's coworkers. Goldsmith offered the evidence to support his pattern and practice claim. Although the district court later granted Bagby Elevator a directed verdict on this claim, the district court ruled that the evidence was still admissible under *Federal Rule of Evidence 406*. Bagby [**54] Elevator contends that, even if this evidence was relevant to Goldsmith's other claims, the district court should have excluded it under *Rule 403* because the evidence was overly prejudicial to Bagby Elevator. We conclude that the district court admitted this evidence for the wrong reason, but this "me too" evidence was otherwise admissible to support Goldsmith's claim of a hostile work environment and to rebut the defenses of Bagby Elevator.

*Rule 406* provides in pertinent part that "[e]vidence of the . . . routine practice of an organization . . . is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the . . . routine practice." *Fed. R. Evid. 406*. We have not announced a precise formula for determining when a practice of an organization is so consistent that it becomes routine or habitual, but we have determined that "'adequacy of sampling and uniformity of response' are controlling considerations [in making such a determination]." *Reyes v. Mo. Pac. R.R., 589 F.2d 791, 795 (5th Cir. 1979)* (quoting *Federal Rule Evidence 406* advisory committee's note); see also *G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1533 (11th Cir. 1985)*. [**55] In U.S. Home Corp., we emphasized that conduct admitted as evidence of habit must reflect a systematic response to specific situations to avoid the danger of unfair prejudice that ordinarily accompanies the admission of propensity evidence:

> It is only when the examples offered to establish such pattern of conduct or habit are "numerous enough to base an inference of systematic conduct" and to establish "one's regular response to a repeated specific situation" or, to use the language of a leading text, where they are "sufficiently regular or the circumstances sufficiently similar to outweigh the danger, if any, of prejudice and confusion," that they are admissible to establish a pattern or habit.

*759 F.2d at 1533* (quoting *Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 511 (4th Cir. 1977))*.

Goldsmith's "me too" evidence does not rise to the level of habit under our precedents. First, Goldsmith offered evidence of only four responses of Bagby Elevator to complaints of racial discrimination. Four examples are not numerous enough to support an inference that Bagby Elevator systematically terminated any black employee who complained about discrimination. Id. Second, each black employee was [**56] terminated in response to a different situation. Three of the four

employees--Goldsmith, Peoples and Jemison--filed charges of discrimination with the EEOC, but Thomas did not. Peoples did not complain about racial slurs like the other three black employees; Peoples instead complained [*1286] about a demotion and asserted that she was subjected to different rules by Bagby Elevator management. Third, at least five different supervisors--Steber, Farley, Braswell, Hunter Bagby, and Bowden--were involved in the termination decisions, and only Steber participated in each decision. Fourth, each termination decision varied in the amount of time that passed between the employee's initial complaint and his termination. In sum, the "me too" evidence was marked by a variety of responses to different situations involving only four black employees.

Although the "me too" evidence was not admissible as evidence of habit, it was otherwise admissible. We can uphold the decision of the district court on any grounds that appear in the record. *Powers v. United States, 996 F.2d 1121, 1123-24 (11th Cir. 1993)*. We conclude that the record supports the admission of this testimony on at least two other grounds.

The "me [**57] too" evidence was admissible, under *Rule 404(b)*, to prove the intent of Bagby Elevator to discriminate and retaliate. We have upheld the admission of coworker testimony in a sexual harassment context under *Rule 404(b)* to prove the defendant's "motive, . . . intent, . . . [or] plan" to discriminate against the plaintiff. *Fed. R. Evid. 404(b)*; *Phillips v. Smalley Maint. Servs., Inc., 711 F.2d 1524, 1532 (11th Cir. 1983)*. Goldsmith and coworkers Jemison and Thomas were discriminated against by the same supervisor, Farley, so the experiences of Jemison and Thomas are probative of Farley's intent to discriminate. Steber was involved in the termination decisions of all four individuals, so the experiences of Jemison, Peoples, and Thomas are probative of Steber's intent.

There was also evidence that was probative of the intent of Bagby Elevator to retaliate against any black employee who complained about racial slurs in the workplace. The evidence about Peoples, Thomas, and Jemison suggested that any black employee of Bagby Elevator who complained about racial discrimination was terminated. After Peoples filed her charge of discrimination with the EEOC, she was required to sign a promissory [**58] note on her employee salary advance, she was reprimanded for disabling automatic deductions from her paycheck, she was warned about having visitors at work, and she received a disproportionate amount of the payroll workload, none of which had ever happened before she filed her charge. Thomas was fired by Bowden for alleged reckless driving that Thomas denied, and Thomas testified that he was fired six weeks after his complaint about Farley's racial slur to Bowden and one week after Thomas had already submitted his resignation to Bowden.

Goldsmith's "me too" evidence was also admissible, under *Rule 402*, as relevant to his claim of a hostile work environment. *Busby v. City of Orlando, 931 F.2d 764, 785 (11th Cir. 1991)*. We have explained that, in some cases, "this testimony goes directly to the issue of racial harassment on the job." Id. The evidence about Peoples, Thomas, and Jemison established the recurrent use of racial slurs by employees of Bagby Elevator and proved that any black employee who complained about racial discrimination was treated differently by supervisors and was ultimately terminated. This evidence supported Goldsmith's claim that Bagby Elevator permitted a severe [**59] and pervasive atmosphere of racial discrimination on its premises.

The "me too" evidence was also probative of several issues raised by Bagby Elevator either on cross-examination or as an affirmative defense. Counsel for Bagby Elevator asked Goldsmith about any and all racist comments about which he knew, not just what he had heard. Counsel for Bagby Elevator also asked Steber if he [*1287] would have countenanced a racially hostile work environment in the shop while Goldsmith worked there, whether anyone other than Goldsmith ever complained to him, and whether there were any complaints of racial slurs made by coworkers during Goldsmith's tenure at Bagby Elevator. Steber answered "no" to each question. The evidence regarding Jemison, Thomas, and Peoples is highly probative of these issues and rebuts Steber's negative responses because there was evidence that Jemison was called a monkey by Walker, Thomas was referred to as a slave by Farley and was the target of the ice cream comment, and Peoples complained to Steber and Braswell about their treatment of her. Bagby Elevator raised a good faith defense, and the "me too" evidence is probative of whether the antidiscrimination and antiretaliation [**60] policies of Bagby Elevator were effective. See *Miller, 277 F.3d at 1279-80*; *Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 419 (11th Cir. 1999)*.

*E. The District Court Did Not Err When It Refused to Instruct the Jury to Disregard the "Me Too" Evidence.*

Bagby Elevator argues that the district court erred when it declined to give the jury an instruction to disregard the "me too" evidence. The proposed instruction prohibited the jury from considering any of the "me too" evidence during its deliberations:

> You have heard testimony and seen exhibits pertaining to the employment histories and terminations of Bagby employees other than plaintiff, including testimony and exhibits regarding EEOC charges and determinations. I specifically instruct you that you are not to consider any of this evidence, whether it be testimony or exhibits, in your jury deliberations.

A refusal to give a requested jury instruction is erroneous only if "(1) the requested instruction correctly stated the law, (2) the instruction dealt with an issue properly before the jury, and (3) the failure to give the instruction resulted in prejudicial harm to the requesting party." *Roberts & Schaefer Co. v. Hardaway Co., 152 F.3d 1283, 1295 (11th Cir. 1998)*. [**61] We conclude that the district court did not err when it declined to give this instruction.

The district court did not err when it failed to give the proposed instruction because the jury could properly consider the "me too" evidence. As we discussed in the previous section, the "me too" evidence was admissible both because it was probative of the intent of the supervisors of Bagby Elevator to discriminate against Goldsmith and was relevant to Goldsmith's hostile work environment claim. See *Busby, 931 F.2d at 785*; *Phillips, 711 F.2d at 1532*. Because this evidence was admissible, it was proper for the jury to consider it during deliberations. Bagby Elevator did not propose an alternative instruction that would have limited the consideration of the "me too" evidence by the jury. Bagby Elevator erroneously argued that the evidence was entirely irrelevant.

The record suggests that the jury weighed this evidence carefully and dispassionately. The jury reached a split verdict that discharged Bagby Elevator from liability for Goldsmith's claim of a hostile work environment and his claim about a failure to promote. A split verdict suggests that the jury reached a "reasoned conclusion free of [**62] undue influence." *United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990)*.

*F. The District Court Did Not Abuse Its Discretion When It Admitted the EEOC Determination.*

Bagby Elevator argues that the district court abused its discretion when it admitted the determination of the EEOC [*1288] that there was cause to believe that Goldsmith's charge of discrimination was true because this evidence was highly prejudicial, stated bare legal conclusions, invaded the province of the jury as to the ultimate issue of discrimination, and lacked the trustworthiness required by *Federal Rule of Evidence 803(8)(C)*. We disagree. The evidence was admissible.

Our precedents explain that an EEOC determination is ordinarily admissible. In Barfield v. Orange County, we considered whether an EEOC determination and report can be excluded from evidence in a jury trial under either *Rule 403* or *Rule 803(8)(C)*, and we concluded that this determination was best left to the sound discretion of the district court. *911 F.2d 644, 650-51 (11th Cir. 1990)*. We explained, "A finding of intentional racial discrimination . . . is a finding of fact. *Rule 803(8)(C)* explicitly makes such evaluative reports admissible, regardless [**63] whether they contain factual opinions or conclusions." *Id. at 651 n.8* (citations omitted). We long ago stated that the probative value of an EEOC determination ordinarily outweighs any possible prejudice to the defendant, *Smith v. Universal Servs., Inc., 454 F.2d 154, 157 (5th Cir. 1972)*, although we more recently recognized in Barfield that there may be some circumstances in which the probative value of an EEOC determination is trumped by the "danger of creating unfair prejudice in the minds of a jury," *911 F.2d at 650*.

Both Goldsmith and Bagby Elevator presented ample evidence at trial to place the EEOC determination in its proper context. Bagby Elevator elicited testimony at trial from Hunter Bagby that there was no factual support in the EEOC determination. Goldsmith elicited testimony from Hunter Bagby that Bagby Elevator had supplied documents to the EEOC during its investigation of the charges of discrimination filed by Peoples, Jemison, and Goldsmith. Steber also wrote a letter to the EEOC before it issued the cause determination, and this letter was admitted as an exhibit at trial and provided factual support for the cause determination.

Bagby Elevator complains that the EEOC [**64] determination was tainted by an untruthful affidavit of union representative Larry Gardner, which stated that Bagby Elevator had not hired any black employees for the field department of Bagby Elevator operations. Again, we disagree. Bagby Elevator corrected this assertion at trial when Gardner admitted during direct examination that Bagby Elevator had hired

one black person for the field in his 13 years as the union representative.

The district court instructed the jury to guard against the improper use of this evidence. The district court explained what an EEOC determination was and emphasized that it was not an adjudication of rights that was binding on the employer:

> Now, as I have previously stated to you, the plaintiff sued the defendant for violation of his rights under Title VII of the Civil Rights Act of 1964. Pursuant to that Act, an individual who believes his rights have been infringed upon must first file a "Charge of Discrimination" with the Equal Employment Opportunity Commission, or the EEOC as it is called, before he or she may bring a lawsuit.
>
> Upon receiving that charge, the EEOC must investigate the
>
> allegation. After investigation, the EEOC may either determine that there [**65] is not reasonable cause to believe the charge is true and dismiss the charge or determine that there is reasonable cause to believe that charge is true. Whether or not the EEOC determines cause, the person who alleges to be aggrieved may file a [*1289] lawsuit. The EEOC's reasonable cause determination is not an adjudication of rights and liabilities. Indeed, it is a nonadversary proceeding designed to notify the employer of the EEOC's findings, which is not reviewable in court and not binding on the employer.

This instruction correctly explained the purpose and character of an EEOC determination and it did not adjudicate rights and liabilities. In the light of this instruction, we cannot conclude that the district court abused its discretion when it admitted the EEOC determination. See *Morro v. City of Birmingham, 117 F.3d 508, 517 (11th Cir. 1997)*.

*G. The District Court Did Not Err When It Instructed the Jury on Damages for Goldsmith's Mental Anguish.*

Bagby Elevator argues that the district court erred when it instructed the jury about damages for mental anguish because Goldsmith did mention the issue in his first closing argument. Bagby Elevator argues that this instruction violated its due [**66] process right to defend itself. This argument parrots the argument of Bagby Elevator regarding Goldsmith's failure to mention punitive damages in his first closing argument, and this argument is similarly without merit.

Bagby Elevator was on notice throughout the litigation that damages for mental anguish were a contested issue. Bagby Elevator was on notice that the plaintiff would seek mental anguish damages based on the complaint, the pretrial order, and the jury charge conference. The conduct of the trial did not suggest otherwise.

Goldsmith's counsel briefly referred to his client's mental anguish in his first closing argument. Although Goldsmith's counsel did not specifically ask the jury for an amount of damages for mental anguish, counsel argued that Bagby Elevator had ridiculed and embarrassed Goldsmith. In rebuttal, counsel for Goldsmith argued that Goldsmith had to borrow money after his termination, lost a substantial amount of money when he was terminated, and deserved to be compensated. Based in part upon these comments, the district court instructed the jury about damages for mental anguish over the objection of Bagby Elevator.

The record also establishes that, throughout [**67] the trial, Bagby Elevator understood that damages for mental anguish remained a contested issue. During the trial, defense counsel argued for the introduction of Goldsmith's paycheck stub with child support withholdings on the ground that it "speaks to the emotional damages, the mental anguish that they are advocating . . . . It would have a great deal to do with it, because he's got this child support withholding that's going to be stopped if he doesn't have a job." During closing arguments, counsel for Bagby Elevator argued that "[Goldsmith] asks Bagby [Elevator], brings Bagby [Elevator] into this courtroom to ask for money for his being upset." Bagby Elevator was not unfairly prejudiced when the district court instructed the jury about damages for mental anguish.

*H. The District Court Did Not Abuse Its Discretion When It Admitted Evidence that Arthur Bagby and Hunter Bagby Uttered the Slur "Nigger."*

Bagby argues that the district court abused its discretion when it allowed Goldsmith to question Steber, Hunter Bagby, and Arthur Bagby about Hunter Bagby's and Arthur Bagby's utterance of the slur "nigger" and to mention this evidence during Goldsmith's closing argument. Bagby Elevator [**68] argues that the racial slurs were irrelevant and that the probative value of this

evidence was substantially outweighed by the prejudice [*1290] suffered by Bagby Elevator, in violation of *Federal Rule of Evidence 403*. We disagree.

The evidence was relevant to issues raised at trial. Steber testified that he had heard Arthur Bagby utter the slur "nigger" at the Birmingham Country Club. This evidence was relevant to whether Steber was aware of the attitude of Bagby Elevator toward racial discrimination by supervisors. If Steber had heard Arthur Bagby, owner and president of Bagby Elevator, utter a racial slur, Steber could have inferred that racially discriminatory acts he perpetrated would be tolerated by Bagby Elevator.

Goldsmith's counsel was entitled to elicit corroborating testimony from Arthur Bagby and Hunter Bagby regarding the racial slurs that Steber heard at the Birmingham Country Club. Arthur Bagby testified that, although he had not uttered the slur at the country club, he had uttered the slur "nigger" before and had used the slur to refer to a black employee of Bagby Elevator. Hunter Bagby testified that he probably uttered the slur "nigger" when he was younger but denied that he [**69] had heard Arthur Bagby utter the slur at any time. The jury was entitled to hear this testimony and evaluate the credibility of the witnesses, and Goldsmith's counsel was entitled to summarize this evidence in closing arguments.

This testimony was also admissible to rebut Bagby Elevator's defense that it enforced an antidiscrimination policy in good faith. Steber testified that it was possible that Steber heard Arthur Bagby utter the slur "nigger" about black employees of Bagby Elevator who, like Goldsmith, worked occasionally at Arthur Bagby's house. Arthur Bagby admitted that he uttered the slur "nigger" in the past and he had used the slur to refer to a black employee of Bagby Elevator. Bagby Elevator asked Goldsmith why he never reported Farley's comments to Arthur Bagby after Steber dismissed them, but Arthur Bagby's routine utterance of racial slurs, whether made in Goldsmith's presence or elsewhere, could have affected Goldsmith's desire to complain to Arthur Bagby about other racial slurs. See *Miller, 277 F.3d at 1279-80*; *Dees, 168 F.3d at 419*.

Bagby Elevator argues that, because Arthur Bagby was not a decisionmaker in Goldsmith's termination, his utterance of the racial slur [**70] is irrelevant, but we disagree. We have ruled that such testimony is admissible, regardless of whether the speaker was a supervisor or whether the slurs were made in the plaintiff's presence, at the discretion of the district court. *Busby, 931 F.2d at 785*. We have concluded that, in some cases, "this testimony goes directly to the issue of racial harassment on the job." Id. This evidence was also relevant because the slur was uttered in the presence of the employee who fired Goldsmith.

Bagby Elevator makes two other arguments regarding why the district court should have excluded this evidence, but both are without merit. First, Bagby Elevator argues that testimony regarding Hunter Bagby's utterance of the racial slur "nigger" was irrelevant because he was a "non-decisionmaker[] in any employment decisions." This assertion is false and is contradicted by Hunter Bagby's testimony that he ultimately rejected Goldsmith's amended version of the agreement and concurred in Goldsmith's termination. Second, Bagby Elevator argues that "there was no evidence the word ['nigger'] was ever used on the premises of Bagby [Elevator]." This assertion is also false. The record establishes that Walker, [**71] Farley, and Bowden uttered racial slurs "on the [*1291] premises of Bagby [Elevator]," including the word "nigger."

*I. The District Court Did Not Abuse Its Discretion When It Admitted the Courtroom Deputy's Testimony*.

Bagby Elevator argues that the court abused its discretion when it allowed Goldsmith to call the courtroom deputy to testify about Arthur Bagby's "Go get 'em champ" comment to Ward. Bagby Elevator argues that her testimony was prejudicial to Bagby Elevator and created the impression in the minds of the jurors that the court supported Goldsmith's case. We disagree.

Bagby Elevator was not unfairly prejudiced by the courtroom deputy's testimony. Bagby Elevator was aware of the policy of the district court that its courtroom deputy would report stray remarks. The courtroom deputy had previously reported a comment made by a black juror who was later dismissed because of the comment, and Bagby Elevator did not object to the application of this policy to dismiss the juror.

Bagby Elevator had the benefit of several procedural safeguards to prevent any undue prejudice. Bagby Elevator cross-examined the courtroom deputy on the comment. See *Parker v. Gladden, 385 U.S. 363, 364-65, 87 S. Ct. 468, 470, 17 L. Ed. 2d 420 (1966)*. [**72] Bagby Elevator recalled Ward to elicit testimony about this alleged comment, and the courtroom deputy testified only after Ward stated that he did not remember

hearing the comment. The district court instructed the jury that the courtroom deputy's testimony should not suggest that the district court or its employees had an opinion about the merits of the case. In the light of these safeguards, Bagby Elevator was not unduly prejudiced when the district admitted the testimony of the courtroom deputy.

*J. Any Error Arising from the Amendment of the Complaint was Harmless.*

Bagby Elevator argues that the district court abused its discretion when it allowed Goldsmith to amend his complaint one day before trial to add a claim for pattern and practice race discrimination. Bagby Elevator argues that this claim cannot be maintained by an individual plaintiff, the amendment was unduly prejudicial to Bagby Elevator, and the amendment deprived Bagby Elevator of its due process right to defend itself. We disagree.

Bagby Elevator suffered no prejudice when the district court allowed Goldsmith to amend his complaint because the district court later dismissed the claim added by the amendment. See *Diversified Corp. Consulting Group, 378 F.3d at 1228* [**73] (where verdict of the jury on two separate claims gave rise to the same relief, defendant could not establish prejudice from the amendment adding the second claim); see also *Fayetteville Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd., 570 F.2d 693, 698-99 (8th Cir. 1978)*. Bagby Elevator also was not prejudiced by the lateness of the amendment because Bagby Elevator admitted during oral argument that it was aware of the evidence admitted in support of the claim long before trial. The district court dismissed this claim at the close of all the evidence, and the evidence that Bagby Elevator discriminated against Goldsmith's coworkers that was admitted in support of this claim was otherwise admissible.

*K. The District Court Did Not Abuse Its Discretion When It Awarded Attorney's Fees and Costs to Goldsmith.*

Finally, Bagby Elevator argues that the district court abused its discretion when it awarded costs and attorney's fees to Goldsmith. Bagby Elevator complains both [*1292] that the award is excessive and that Goldsmith, who did not prevail on half of his claims, was not a "prevailing party" under the statute that permits the district court to award an attorney's fee. *42 U.S.C. § 1988*. We disagree. [**74] Goldsmith was a prevailing party and the attorney's fees and costs awarded to Goldsmith were reasonable.

Under *section 1988*, "a prevailing plaintiff should recover reasonable attorneys' fees unless special circumstances render an award unjust." *Gaines v. Dougherty County Bd. of Educ., 775 F.2d 1565, 1569 (11th Cir. 1985)*. "To be a 'prevailing party,' it is not necessary for a plaintiff ultimately to prevail on each and every claim asserted or to receive all the relief requested;" he needs to prevail on some of his claims. *Doe v. Busbee, 684 F.2d 1375, 1379 (11th Cir. 1982)*. The Supreme Court has explained that an attorney's fee should be reduced when a plaintiff has not prevailed on a distinct claim or has achieved only modest success:

> Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved [**75] only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Hensley v. Eckerhart, 461 U.S. 424, 440, 103 S. Ct. 1933, 1943, 76 L. Ed. 2d 40 (1983)*.

The district court concluded that Goldsmith achieved substantial success on his related claims. The district court awarded costs and attorney's fees based on the verdict in favor of Goldsmith on his claims of retaliation and termination based on race. The district court reviewed the submissions of both parties regarding attorney's fees and costs and awarded Goldsmith approximately $ 160,000. The district court stated that it "does not find [the award] to be inflated or out of proportion with the sums the court would expect from litigation of this type" and thus "decline[d] to adjust the lodestar to account for other considerations," including Goldsmith's failure to prevail on three claims.

The district court did not abuse its discretion. A review of the record establishes that evidence supporting Goldsmith's successful claims were inextricably intertwined with evidence supporting his unsuccessful claims, and the punitive damage award was supported by evidence underlying the unsuccessful [**76] claims. The "me too" evidence was admissible both as evidence

of the intent of Bagby Elevator to retaliate against Goldsmith and as evidence of Goldsmith's hostile work environment claim. The evidence regarding Goldsmith's failure to promote claim provided the basis for Goldsmith's first EEOC charge, which was in turn necessary for Goldsmith to prove his claim of retaliation. The evidence regarding the EEOC investigation and cause determination supported all of Goldsmith's claims. Because Goldsmith's successful claims were related to his unsuccessful claims and he "won substantial relief," we conclude that the refusal of the district court to reduce the amount of attorney's fees and costs was not an abuse of discretion. Id.

## V. CONCLUSION

The judgment of the district court is **AFFIRMED**.

---

End of Document